## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN WILD HORSE CAMPAIGN<br>4115 Jalama Road<br>Lompoc, CA 93426,<br><br>WESTERN WATERSHEDS PROJECT<br>126 South Main Street, # B2<br>Hailey, ID 83333,<br><br>THE CLOUD FOUNDATION<br>107 South 7th Street<br>Colorado Springs, CO 80905,<br><br>LAURA CUNNINGHAM<br>Mile Marker 64.7, U.S. Highway 95<br>Beatty, NV 89003,<br><br>     Plaintiffs,<br><br>     v.<br><br>RYAN ZINKE, Secretary<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240,<br><br>BRIAN STEED, Acting Director<br>Bureau of Land Management<br>1849 C Street, N.W.<br>Washington, DC 20240,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>   Civ. No. 18-1529<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1.     This case challenges the decision by the Interior Department's Bureau of Land

Management ("BLM") under the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"

or "WHA"), 16 U.S.C. §§ 1331-1340, to round up and permanently remove all wild horses from

over 700,000 acres of public lands called the Caliente Herd Area ("HA") Complex, on the

purported grounds that there is not enough forage and habitat for the horses, even though the

BLM permits grazing on the same public lands by thousands of cattle and sheep that, unlike wild

horses, are not statutorily "protected" as an "integral part of the natural system of the public

lands." 16 U.S.C. § 1331. The BLM's decision, made in the 2008 Final Resource Management

Plan for the Ely District ("2008 Final RMP")—which encompasses the Caliente Complex—and

implemented by the 2018 Final Environmental Assessment for the Caliente Complex Wild Horse

Gather ("2018 Final EA"), has violated the agency's obligations under the WHA to "protect and

manage" these "wild and free-roaming" horses as "living symbols of the historic and pioneer

spirit of the West" and to ensure that "all management activities shall be at the minimal feasible

level." *Id.* §§ 1331, 1333(a). Moreover, by eliminating one of the chief uses of these public lands

under the agency's multiple use mandate—i.e., wild horse use—while leaving livestock grazing

virtually untouched, even though livestock use the same forage, water, and other resources as

wild horses, the BLM has violated its obligation under the Federal Land Policy and Management

Act ("FLPMA") to administer the public lands for "multiple use," which is defined as "the

management of the public lands and their various resource values so that they are utilized in the

combination that will best meet the present and future needs of the American people . . . . with

consideration being given to the relative values of the resources and not necessarily to the

combination of uses that will give the greatest economic return or the greatest unit output." 43

U.S.C. 1702(c).

     2.     In making its decision to remove all of the wild horses from the public lands in

the Caliente Complex, the BLM also failed to give full and accurate consideration to the

alternatives to, and the environmental impacts of, the proposed action. Specifically, the BLM:

failed to disclose the range monitoring data supporting its decision to remove all wild horses

from the Caliente Complex, and as such, fell far short of the requirement to adequately disclose and consider baseline information and the environmental impacts of its action; failed to adequately analyze the cumulative environmental effects of livestock grazing and wild horse use on the range; and failed to consider reasonable alternatives, such as the obvious alternative of reducing the amount of livestock permitted on these federal public lands. Additionally, the BLM failed to adequately consider and respond to public comments requesting, for example, that the agency provide the range monitoring data and methods used to determine that the Caliente Complex suffered from resource scarcity due to wild horse use, consider alternatives that would reduce livestock grazing, and explain how its decision complied with its obligations under the WHA and FLPMA. Thus, the public was deprived of an opportunity to meaningfully assess and respond to the rationale underlying the BLM's decision. For these reasons as well as those set forth below, the BLM has violated its obligations under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f.

3.      The BLM's decision to remove all federally protected wild horses from an area historically designated for wild horse use is even more untenable when considered in conjunction with the agency's failure to provide *any* data to support its conclusory assertion that the Caliente Complex is no longer "adequate" for wild horse use, despite multiple requests for such an explanation from Plaintiffs and other members of the public. Thus, in failing to provide a legally supportable explanation for eliminating all wild horse use from the Caliente Complex, the BLM has also violated its obligations under NEPA, 42 U.S.C. §§ 4321-4370f, the Wild Horse Act, 16 U.S.C. §§ 1331-1340, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

4.      For all of these reasons as well as those set forth below, Defendants have acted  in a manner that is "arbitrary and capricious, an abuse of discretion," and "otherwise not in

accordance with law," and "without observance of procedure required by law," within the

meaning of the judicial review provision of the APA, 5 U.S.C. § 706(2)(A), (D).  Accordingly,

the BLM's decision to eliminate wild horse use from the Caliente Complex should be vacated

and remanded.  *Id.*

## JURISDICTION

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## PARTIES

6.      Plaintiff American Wild Horse Campaign ("AWHC") is a broad-based coalition

of public interest groups, environmentalists, humane organizations, and historical societies

representing over ten million supporters. Members of the organizations represented by AWHC

enjoy viewing wild horses on public lands, including in the area known as the Caliente Complex.

AWHC submitted comments on the BLM's 2007 Proposed RMP/Final Environmental Impact

Statement for the Ely District ("2007 Proposed RMP/Final EIS"), which encompasses the

Caliente Complex, as well as on the agency's 2017 Preliminary Environmental Assessment

("2017 Preliminary EA") concerning proposed roundups in the Caliente Complex.  In those

collective comments, AWHC opposed the removal of all wild horses from these public lands;

explained that the BLM must, at the very least, offer an explanation for its decision beyond the

conclusory assertion that forage and habitat are unsuitable for wild horse use; urged the BLM to

take a hard look at the impacts of livestock use on the relevant public lands; and suggested

alternative ways the BLM could manage the wild horses in these areas without violating the

WHA, including by reducing livestock use of these public lands.

7.      The BLM's decision to round up large numbers of wild horses from these herds

and to permanently eliminate wild horses from this area of public lands—thus permanently

transforming these lands from Herd Management Area ("HMA") to HAs—while at the same time authorizing livestock grazing at essentially the same levels historically authorized under the Taylor Grazing Act harms AWHC's organizational interest and the interests of its coalition members in protecting and preserving viable "free-roaming" herds of "wild" horses on public lands, and their aesthetic and recreational interests in observing wild horses engaged in their natural behaviors on these public lands.

8.     AWHC brought a lawsuit in 2011 challenging the BLM's attempt to similarly remove all wild horses from Jakes Wash, another area of public lands governed by the same 2008 Final RMP, without considering the combined effects of livestock grazing and wild horse use, or the obvious alternatives of reducing livestock grazing in addition to, or instead of, reducing wild horse use of the Pancake Complex in light of similar alleged resource scarcity issues. After AWHC filed its opening summary judgment brief in this Court, *see Am. Wild Horse Pres. Campaign v. Salazar*, No. 1:11-cv-2222-BAH (D.D.C.), BLM voluntarily dismissed its case. AWHC has been forced to spend significant organizational resources monitoring, commenting on, opposing, and challenging in court, yet again, this substantially similar illegal management action, when such extremely limited resources could otherwise be spent on other programs and activities to advance AWHC's mission.

9.     A court order enjoining the BLM from gathering, removing, and otherwise harming these wild horses will protect AWHC's interests and those of its coalition members in the welfare and continued existence of viable free-roaming herds of wild horses, and will allow AWHC to devote its limited resources to other wild horse preservation and protection programs.

10.     Plaintiff Western Watersheds Project ("WWP") is a nonprofit conservation group founded in 1993 with 1,500 members and field offices in Idaho, Montana, Washington,

Wyoming, Arizona, Oregon, and Nevada. WWP protects and restores western watersheds and wildlife through education, public policy initiatives, and litigation—with a particular focus on public lands management in eight western states including Nevada. WWP brings this case on behalf of the organization and its members.

      11.     On behalf of its members and supporters, WWP submitted comments on the BLM's 2007 Proposed RMP/Final EIS, opposing the lack of reductions in livestock grazing on the public lands governed by the land management plan—including the Caliente Complex— while at the same time scapegoating wild horses for resource damage the agency identified on these lands, and requesting that the BLM provide the data supporting its decision. WWP also submitted comments on the BLM's 2017 Preliminary EA for the roundups in the Caliente Complex, opposing the removal of all wild horses from these public lands without considering reductions in domestic livestock; explaining that the BLM must, at the very least, offer an explanation for its decision beyond the conclusory assertion that forage and habitat are unsuitable for wild horse use; urging the BLM to take a hard look at the impacts of livestock use on the relevant public lands; and suggesting alternative ways the BLM could manage the wild horses in these areas without violating the WHA, including the reduction of livestock use. Additionally, along with AWHC, WWP brought a case in 2011 challenging the BLM's attempt to similarly remove all wild horses from Jakes Wash, which was dismissed as moot after BLM withdrew that decision. WWP has been forced to spend significant organizational resources monitoring, commenting on, opposing, and once again challenging in court this substantially similar illegal management activity, when such resources could otherwise be spent on other programs to advance WWP's mission.

12.     WWP's interests in the preservation of natural habitats on the public lands in these areas will also be harmed by the BLM's implementation of the 2008 Final RMP for this area by removing all of the wild horses from the Caliente Complex, because the BLM has consistently failed to analyze the impacts of livestock grazing in the same areas and failed to consider reasonable alternatives that would better protect wild horses and the range's resources, including the obvious alternative of reducing the amount of cattle and sheep that are permitted to graze on these same public lands. To the extent that removal of wild horses leads to a corresponding increase in domestic livestock grazing in the Caliente Complex, which is not subject to legal standards to maintain "a thriving natural ecological balance" that apply to wild horses under the WHA, WWP's interest in restoring healthy native ecosystems is harmed. WWP submitted extensive comments and protests to the 2008 Final RMP and accompanying EIS, opposing the BLM's continuation of the same levels of livestock use while attempting to extirpate wild horses from the Caliente Complex.

13.     A court order enjoining the BLM from gathering, removing, and otherwise harming these wild horses will protect WWP's interests and those of its members in the welfare and continued existence of viable free-roaming herds of wild horses, and will allow WWP to devote its limited resources to other conservation programs.

14.     Plaintiff The Cloud Foundation is a 501(c)(3) nonprofit organization headquartered in Colorado Springs, Colorado. The organization is dedicated to the preservation of wild horses and burros on public lands in the western United States including in the Caliente Complex. The members of The Cloud Foundation enjoy viewing, studying, photographing, and filming wild horses in their natural habitats, free from human interference. The Cloud

Foundation's members travel to various areas, including public lands in Nevada, specifically for the purpose of viewing wild horses.

15.     On behalf of its members and supporters, The Cloud Foundation submitted comments on the BLM's 2017 Preliminary EA for the roundups in the Caliente Complex, opposing the removal of all the wild horses; explaining that the BLM must, at the very least, offer an explanation for its decision beyond the conclusory assertion that forage and habitat are unsuitable for wild horse use; urging the BLM to take a hard look at the impacts of livestock use on the relevant public lands; and suggesting alternative ways the BLM could manage the wild horses in these areas without violating the WHA, including the reduction of livestock use. A court order enjoining the BLM from gathering, removing, and otherwise harming these wild horses will protect The Cloud Foundation's interests and those of its members in the welfare and continued existence of viable free-roaming herds of wild horses, and will allow TCF to devote its limited resources to other wild horse preservation and protection programs.

16.     Laura Cunningham has been a permanent resident of Beatty, Nevada since 2002. She has enjoyed traveling to and recreating in Nevada since 1990. Ms. Cunningham is an author-artist, and has worked in the field of wildlife biology and environmental advocacy for many years. She is currently employed as the California Director at Western Watersheds Project, where she has worked since March 1, 2018 and where she is also a member.

17.     Ms. Cunningham is a frequent user of the many public lands in southeastern Nevada, including those that comprise the Caliente Complex, and the Ely District of which the Caliente Complex is a part—i.e., the lands governed by the 2008 Final RMP and the 2018 Final EA. To Ms. Cunningham, each mountain in the area is unique, and she cherishes her ability to hike and explore them, and to become familiar with the special experience that each peak offers.

She has camped at Cathedral Gorge State Park, and traveled through the Little Mountain HMA and Miller Flat HMA—both of which comprise parts of the Caliente Complex—as she explored the public lands in this region. She has engaged in birdwatching in the Joshua tree deserts and arid grasslands of the Delamar HMA, and has toured the Meadow Valley Wash area while visiting the Moapa National Wildlife Refuge to the south near the Mormon Mountains HA. After these visits, as she drives north towards Caliente and Elgin, she crosses the lands that comprise the Complex to enjoy the scenery and the wild horses. As recently as 2016, Ms. Cunningham camped and hiked in Timber Mountain, which has an isolated "sky island" ponderosa pine forest on its peak. As she hiked to the top, she reveled in the views overlooking the Delamar Valley, Delamar Mountains, and the Caliente and Pioche areas to the east.

18.     While visiting these areas, Ms. Cunningham enjoys camping, hiking, birdwatching, and observing the flora and fauna. She also engages in photography and field sketching as hobbies, and particularly enjoys viewing, photographing, and sketching the wild horses that roam in the basins and on the ranges of Nevada. Ms. Cunningham greatly values the recreational opportunities provided by these public lands, and is deeply invested in maintaining the wild horse populations and ensuring a healthy and productive range habitat for all wildlife and vegetation.

19.     In both the summer and fall of 2018, Ms. Cunningham has concrete plans to continue her explorations by returning to several of the areas in southeastern Nevada that are directly and indirectly impacted by the BLM's decision articulated in the 2008 Final RMP and implemented by the 2018 Final EA. This summer, she will visit the Clover Mountains BLM Wilderness on a car-camping trip to hike the area and view the wild horses, elk, pronghorn antelope, and other wildlife. In the fall, she will explore the Tule Desert, and will drive through

areas comprising the Caliente Complex. Ms. Cunningham also plans to return to these area several times in the coming years as she passes through the Delamar HMA on her way to the new Basin and Range National Monument that lies just to the west. On all of these trips, she plans to stop and soak in the beauty of the scenery and the wildlife—particularly the wild horses—as she proceeds on her journey.

20.    The removal of all of the wild horses from the Caliente Complex will negatively impact Ms. Cunningham's recreational plans, and injure her ability to enjoy the wild scenery and landscapes of the area. Additionally, extirpation of the wild horses from the Complex will injure her ability to engage in her hobbies of photographing and sketching wild horses in these areas of Nevada, which she frequently visits for their sweeping landscapes and majestic wildlife. A court order enjoining the BLM from gathering, removing, and otherwise harming these wild horses will protect Ms. Cunningham's interests in the welfare and continued existence of viable free-roaming herds of wild horses.

21.    Defendant Ryan Zinke is the Secretary of the Department of the Interior, the parent agency of the BLM, and, accordingly, is ultimately responsible for the decision challenged here.

22.    Defendant Brian Steed is the Acting Director of the BLM, and therefore is also responsible for the decision at issue.

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

## I.    STATUTORY AND REGULATORY FRAMEWORK

### A.    The Wild Free-Roaming Horses And Burros Act

23.    Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms

within the Nation and enrich the lives of the American people," Congress enacted the WHA to ensure that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and that they are "considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

24.     The Wild Horse Act provides that the Secretary of the Interior "shall manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). To further ensure this objective, the statute provides that "[a]ll management activities shall be at the minimal feasible level." *Id.* The WHA's implementing regulations further require that "[w]ild horses and burros shall be managed as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat." 43 C.F.R. § 4700.0-6(a).

25.     The BLM recognizes two types of management areas for wild horses that are relevant here—HMAs and HAs. *Id.* §§ 4700.0-5(d), 4710.3-1. An HMA is an area "established for the maintenance of wild horse and burro herds." 43 C.F.R. § 4710.3-1. An HA is any "geographic area identified as having been used by a [wild horse or burro] herd as its habitat in 1971" when the WHA was enacted, but that is not managed for wild horses at present. *Id.* § 4700.0-5(d).

26.     Nearly 26.9 million acres of the 245 million acres of public lands under the jurisdiction of the BLM are managed for wild horse and burro use and protection. In delineating areas for wild horse use, the BLM "shall consider the appropriate management level for the herd, the habitat requirements of the animals, [and] the relationships with other uses of the public and adjacent private lands." 43 C.F.R. § 4710.3-1. The appropriate management level ("AML") is

"expressed as a population range within which [wild horses] can be managed for the long term" in a given management area without resulting in rangeland damage. BLM Handbook at 4.2.1; *see also* 16 U.S.C. § 1331(b)(1) (authorizing the BLM to determine AMLs). In establishing, evaluating, or adjusting an AML for a given management area, the BLM must "include an in-depth evaluation of intensive monitoring data or land health assessment . . . . includ[ing] studies of grazing utilization, range ecological condition and trend, actual use, and climate (weather) data [as well as] [p]opulation inventory, use patterns and animal distribution." BLM Handbook at 4.2.2.1, 4.2.2.2.

27.     Should the BLM, on the basis of the AML and other factors, make a two-part determination that: (a) there is an overpopulation of wild horses in a given area of public lands and (b) those horses must be removed, the agency may undertake measures to remove "excess" animals in order "to restore a thriving natural ecological balance to the range." 16 U.S.C. § 1333(b). The term "excess" is defined as those "wild free-roaming horses or burros . . . which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id.* § 1332(f). As when it adjusts an AML, in making an "excess" determination, the BLM "shall analyze grazing utilization and distribution, trend in range ecological condition, actual use, climate (weather) data, current population inventory . . . and other factors such as the results of land health assessments which demonstrate removal is needed to restore or maintain the range in a" thriving natural ecological balance. BLM Handbook at 4.3.

28.     As made clear by the WHA's implementing regulations, the BLM "may close appropriate areas of the public lands to grazing use by all or a particular kind of livestock . . . [i]f

necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury." 43 C.F.R. § 4710.5(a).

29.     In the event that the BLM determines that a herd management area is no longer capable of sustaining any wild horses due to insufficient forage, water, cover, or space, the BLM must accompany such a finding with "a detailed description of the analysis and the rationale used in making the determination that a key habitat component either is (or is not) sufficient to support healthy [wild horse and burro] populations and healthy rangelands over the long-term." BLM Handbook, app. 3 at 69.

## B.      The Taylor Grazing Act

30.     Under the Taylor Grazing Act ("TGA"), 43 U.S.C. §§ 315-315r, the Secretary of the Interior, through the BLM, is "authorized" to issue permits for the grazing of livestock on public lands "upon the payment of reasonable fees." 43 U.S.C. § 315b. The statute further provides, however, that "the creation of a grazing district or the issuance of a [grazing] permit . . . shall not create any right, title, interest, or estate in or to the lands." *Id.*

31.     The TGA further provides that the Secretary "is authorized, in his discretion, to . . . classify any lands within a grazing district, which are . . . more valuable or suitable for any other use" than grazing, *id.* § 315f, which includes use by wild horses.

## C.      The Federal Land Policy and Management Act

32.     The Federal Land Policy Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1787, is also administered by the BLM. It requires that certain public lands and their resources be "periodically and systematically inventoried and their present and future use [] projected through a land use planning process." *Id.* § 1701(a)(2). FLPMA further mandates that "public lands be managed in a manner that will protect the quality of scientific, scenic, historical,

ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." *Id.* § 1701(a)(8). FLPMA requires the public lands to be administered for "multiple-use," which Congress defined as "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people . . . with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." *Id.* § 1702(c).

33.      FLPMA's implementing regulations require the BLM to periodically develop, maintain, and revise "resource management plans" ("RMPs")—written documents "designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. § 1601.0-2.

### D.      The National Environmental Policy Act

34.      Congress enacted the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331-4370f, to ensure that federal agencies consider the environmental impacts of their actions before taking them, and to further ensure that they consider all reasonable alternatives to proposed actions that may have less adverse impacts on the environment.

35.      To meet these objectives, all agencies are required to prepare an EIS for major federal actions that may "significantly affect" the environment. *Id.* § 4332(C). The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA that are "binding on all Federal agencies." 40 C.F.R. § 1500.3. These regulations provide that in determining whether an EIS is required with

respect to a particular proposed action, an agency must prepare an Environmental Assessment ("EA") that analyzes the environmental impacts of the proposed action as well as alternatives. *Id.* §§ 1501.4(c), 1508.9. The EA must "briefly provide sufficient evidence and analysis for determining whether" the environmental impacts are significant such that an EIS is required. *Id.* § 1508.9. To that end, the EA must analyze the "direct" impacts of the proposed action, i.e., those that result directly from the management action, the "indirect" impacts, which include those caused by the action that are later in time but are "still reasonably foreseeable," and the "cumulative" effects, which include those impacts that "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* §§ 1508.7, .8, .9.

36.     An agency must analyze reasonable alternatives to the proposed action, regardless of whether it prepares an EIS or an EA. 40 C.F.R. § 1508.9. CEQ has deemed the alternatives analysis "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* § 1502.14.

37.     The CEQ regulations further provide that NEPA procedures "must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1. Thus, to "the extent practicable," the agency "shall involve" the public in preparing an EA. *Id.* §§ 1501.4(b), 1508.9(a)(1).

38.     If, in preparing the EA, the agency finds that the action "will not have a significant impact on the environment, it must issue a Finding of No Significant Impact ("FONSI"), which must present the reasons for the agency's determination. *Id.* § 1508.13.

39.     At the time of its decision, the agency must prepare and issue "a concise public record of decision." 40 C.F.R. § 1505.2. The ROD must state the agency's decision, identify the alternatives considered, and describe the means adopted to avoid or minimize environmental harm. *Id.*

E.      **The Administrative Procedure Act**

40.     Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).  An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

41.     When reviewing agency action under the APA, the court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfr. Ass'n*, 463 U.S. at 43.  The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

II.  **FACTUAL BACKGROUND**

A.      **The Pertinent Land Use Plans**

42.     The Caliente Complex is managed by the BLM and consists of an estimated 911,892 acres of public lands located within a forty-mile radius of Caliente, Nevada in Lincoln

County. The Complex has been managed for wild horse use since 1971, and encompasses nine

HMAs: Mormon Mountains; Meadow Valley Mountain; Blue Nose Peak; Delmar Mountains;

Clover Mountains; Clover Creek; Applewhite; Little Mountains; and Miller Flat. These same

public lands encompass portions of twenty-six grazing allotments, on which the BLM authorizes

over 4500 cattle to graze.

      43.     In 1999, the BLM undertook a FLPMA planning process for lands under its

jurisdiction, including the Mormon Mountains HMA. In the Management Framework Plan

("MFP") process—the precursor to the RMP format—the BLM recognized the need "to help

recover and delist the [endangered] desert tortoise within a multiple use management context

within a portion of the Ely District." U.S. Dep't of Interior, Bureau of Land Mgmt., Approved

Caliente Management Framework Plan Amendment and Record of Decision for the Management

of Desert Tortoise Habitat 1 (Sept. 19, 2000). Therefore, in 2000, the BLM issued an Approved

Caliente MFP Amendment and ROD for the Management of Desert Tortoise Habitat, which

dropped the Mormon Mountains from HMA to HA status. *Id.* at 20. This decision was carried

forward into the 2008 Final RMP. *See* U.S. Dep't of Interior, Bureau of Land Mgmt., Caliente

Herd Area Complex Wild Horse Gather 4 (April 26, 2018) ("2018 Final EA").

      44.     The remaining eight HMAs—Meadow Valley Mountain; Blue Nose Peak;

Delmar Mountains; Clover Mountains; Clover Creek; Applewhite; Little Mountains; and Miller

Flat—consist of over 700,000 acres and have historically been managed for wild horse use.

      45.     In 2005, the BLM's Ely District undertook a FLPMA planning process for lands

under its jurisdiction, including the remaining eight HMAs in the Caliente Complex. At the time

of the RMP process, the BLM had established an AML of 1 for the Applewhite HMA, 1 for the

Blue Nose Peak HMA, 1-14 for the Clover Creek HMA, 1-16 for the Clover Mountain HMA,

51-85 for the Delmar Mountains HMA, 9-15 for the Little Mountain HMA, and 0-15 for the

Miller Flat HMA. The Meadow Valley Mountain and Mormon Mountain HMAs had an AML of

zero. Thus, at the beginning of the RMP planning process, the AML for the Caliente Complex

was 64-146 wild horses for the 736,469-acre complex.

46.     In the RMP process, the BLM recognized its need to "[m]aintain and manage

healthy, self-sustaining wild horse herds inside herd management areas within appropriate

management levels to ensure a thriving natural ecological balance." U.S. Dep't of Interior,

Bureau of Land Mgmt., Ely District Record of Decision and Approved Resource Management

Plan 46 (Aug. 20, 2008) ("2008 Final RMP"). However, in November 2007, the BLM issued the

2007 Proposed RMP/Final EIS, *see* U.S. Dep't of Interior, Bureau of Land Mgmt., Ely Proposed

Resource Management Plan/Final Environmental Impact Statement (Nov. 2007), that proposed

permanently eliminating wild horses from sixteen longstanding HMAs on nearly a combined 1.6

million acres of public lands in Nevada, including the HMAs that comprise the Caliente

Complex, purportedly on the grounds that not enough forage and habitat existed in these areas to

sustain any of the horses. At the same time, the BLM proposed to authorize continued extensive

livestock grazing on those same public lands by thousands of cattle and sheep that use the same

forage, water, habitat, and other resources that are used by the horses.

47.     The Proposed RMP/Final EIS provided a table summarizing the BLM's

evaluation of the suitability of habitat within each HMA in the planning area, including those

within the Caliente Complex, for wild horse use. *See* 2007 Proposed RMP/Final EIS at 3.8-4 to -

5. The chart identified five habitat suitability components—forage, water, space, cover, and

reproductive viability—and listed whether the component was "adequate" or "inadequate" for

each HMA. *Id.* An inadequate rating in just one of the five habitat suitability components "was

considered to render the [HMA] unsuitable" for any wild horse use. *Id.* at 3.8-7. The BLM did

not provide any explanation as to how it determined the adequacy of each habitat component.

48.     Although the BLM acknowledged that past grazing management and altered fire

regimes were significant factors contributing to the degradation of vegetation on the rangelands,

the BLM did not provide site-specific data, nor did it consider alternatives that would reduce

livestock grazing while still managing areas for wild horse use. 2007 Proposed RMP/Final EIS at

3.5-8.

49.     Moreover, the 2007 Proposed RMP/Final EIS did not provide any data concerning

the BLM's evaluation of grazing allotments for meeting rangeland health standards. It merely

noted that evaluations and watershed analyses were ongoing.

50.     Throughout the RMP process, and specifically in response to the 2007 Proposed

RMP/Final EIS, Plaintiff WWP and others submitted detailed comments objecting to "the

dramatic reduction in . . . wild horses . . . to make way for continued high and abusive levels of

cattle and sheep grazing on [these] public lands," particularly because the BLM has never

"conducted sufficient monitoring to allow it to separate impacts and uses by horses and cattle, or

to determine the resources available to horses (particularly in the areas that are to be eliminated

as herd or use areas)—or the ecological impacts of livestock vs. horses." Plaintiff WWP also

questioned how habitat in a given area that the BLM has deemed unsuitable for a single wild

horse is nonetheless suitable for extensive livestock grazing, and it pointed out BLM's failure in

the Proposed RMP to provide any site-specific data or analysis of the relative ecological and

resource impacts attributed to wild horses and livestock to support the decision to eliminate wild

horses from their longstanding management areas.

51.     In August 2008, the BLM issued the 2008 Final RMP, in which the BLM finalized its decision to permanently remove all wild horses from sixteen longstanding HMAs, including eight of the nine HMAs in the Caliente Complex—i.e., the BLM set the AMLs for these areas at to zero. *See* 2008 Final RMP at 48.

52.     The 2008 Final RMP listed both the grazing allotments that had been evaluated for meeting rangeland health standards, and those that had not yet been evaluated for meeting those standards. For the allotments that purportedly met rangeland health standards—several of which are located within the Caliente Complex—the BLM did not provide any data to support its assertion, nor did it explain how it differentiated impacts from livestock grazing from those resulting from wild horse use. Additionally, four of the allotments that had not yet even been evaluated were located within the Caliente Complex. Therefore, despite uncertainty regarding the health of the range and the impact of livestock grazing on the same public lands that the BLM insisted were not suitable for wild horse use, the BLM still set the AML for those lands at zero.

53.     In the Final RMP, the BLM did not address many of the comments raised by Plaintiff WWP and others throughout the RMP process. For example, the BLM did not address WWP's call for site-specific data and analysis of ecological and resource impacts attributed to wild horses and livestock to explain the decision to permanently eliminate wild horses from these longstanding management areas while allowing livestock use to continue unchanged. Nor did the BLM address WWP's position that the BLM must consider reasonable alternatives short of extirpation of wild horses in sixteen longstanding wild horse management areas, such as a reduction in livestock grazing, in order to satisfy the BLM's mandate under the WHA to "protect" these wild horses and its duty to ensure "multiple use" of these lands under FLPMA.

**B.      The BLM's June 9, 2009 Preliminary EA for the Initial Caliente Complex Gather**

54.      In June 2009, there were an estimated 270 wild horses within the nearly one-million-acre Caliente Complex. 2009 Prelim. EA § 1.1.

55.      On June 9, 2009, the BLM issued a preliminary EA on its proposed action "to capture 100% of the current population of wild horses" from the Caliente Complex HAs, which at the time, amounted to approximately 270 horses. U.S. Dep't of Interior, Bureau of Land Mgmt., Caliente Complex Gather § 2.2 (June 11, 2009) ("2009 Preliminary EA"). BLM reported that this site-specific action was needed to bring the agency in conformance with the programmatic 2008 Final RMP—i.e., to implement its determination that there is not enough forage and habitat to sustain any of these horses. *Id.* § 1.3.

56.      BLM's 2009 EA purported to be based on monitoring data and analysis from the 2008 Final RMP, but the BLM did not explain or support its determinations regarding habitat suitability in the 2007 Proposed RMP/Final EIS, the 2008 RMP, or in the 2009 Preliminary EA. Moreover, despite explicitly acknowledging that the agency relied in part on monitoring data collected from 2007-2009 in reaffirming its decision to eliminate all of the wild horses from the Caliente Complex, *see id.* § 1.1, the 2009 Preliminary EA did not provide those data to the public.

57.       Livestock and wild horses use the same forage and also compete for water and other resources on the range. However, the 2009 Preliminary EA failed to discuss the impacts that livestock use were having on those same habitat suitability components that rendered an area "inadequate" for wild horse use. Instead, the BLM stated that such analysis was "ongoing," without explaining how it could have made a decision to remove all wild horses without completing that analysis.

21

58.     The BLM conducted a gather and removal of wild horses from the Caliente Complex in October 2009. However, the BLM was evidently unsuccessful in implementing the objectives of the 2008 RMP through the 2009 site-specific gather decision. There have been no further gathers in the Caliente HAs. *See* 2018 Final EA at 6.

### C.     The BLM's 2011 EA for the Pancake Complex

59.     On November 28, 2011, the BLM issued a site-specific Final EA, Dep't. of Interior, Bureau of Land Mgmt., Environmental Assessment: Pancake Complex Wild Horse Gather (November 28, 2011) ("Pancake Complex EA"), FONSI, and ROD that implemented the 2008 Final RMP with regards to the "Pancake Complex" in Nevada, which the BLM defined as including the Jakes Wash HA. Particularly relevant here, the BLM decided to eliminate all of the wild horses from Jakes Wash, based on the BLM's determination that "[r]emoval of all excess wild horses from the Jakes Wash HA is needed" to meet the management directives of the 2008 Final RMP. Pancake Complex EA at 3-4. However, according to the agency, at the time of the decision, Jakes Wash supported 132 wild horses. Additionally, according to the agency's own records, the BLM allowed up to 2,320 cows and 3,131 sheep to graze in Jakes Wash.

60.     Plaintiffs AWHC, WWP, and TCF, with several individuals, challenged both the programmatic 2008 Final RMP and the site-specific Pancake Complex EA and ROD. Plaintiffs alleged, *inter alia*, that the BLM failed to explain, either in the 2008 Final RMP or in the Pancake Complex ROD, its decision to remove all of the wild horses from Jakes Wash on the ground that there was purportedly "inadequate" forage, water, habitat, and other resources available for wild horses while continuing to allow livestock—which use the same forage as wild horses and also compete for water and other resources on the range—to remain in the same area at the same levels, particularly when the Final EA conceded that significant livestock grazing

22

occurred in Jakes Wash; that the agency failed to analyze the impacts of livestock on the health

of the public lands, or whether the alleged adverse impacts in these areas were caused by

livestock rather than by wild horses; that the BLM failed to consider alternatives that would

achieve a thriving natural ecological balance in Jakes Wash, including a reduction in the number

of cattle and sheep authorized by the BLM to graze in Jakes Wash, which would provide more

habitat, forage, and water for wild horses; and that it was arbitrary and capricious for the BLM to

completely zero out an area of public lands—i.e., Jakes Wash—to wild horse use, while at the

same time authorizing grazing at essentially the same levels historically authorized under the

TGA.

61.     After Plaintiffs filed their opening summary judgment brief, the government

voluntarily dismissed the case after the Court denied its motion to strike certain expert

declarations filed by Plaintiffs with their opening brief.  *See Am. Wild Horse Pres. Campaign v.*

*Salazar*, 859 F. Supp. 2d 33 (D.D.C. 2012) (Howell, J.).

**D.      The BLM's November 2017 Preliminary EA for the Caliente Herd Area
         Complex Wild Horse Gather**

62.     In November 2017, purportedly in conformance with the 2008 Final RMP, the

BLM issued a preliminary EA on its proposed action to round up *all* of the wild horses from the

Caliente Complex in an "initial gather," and to conduct "follow-up gathers" over the next ten

years from the date of the initial gather until there are no wild horses remaining in the Caliente

Complex.  U.S. Dep't of Interior, Bureau of Land Mgmt., Preliminary Environmental

Assessment: Caliente Herd Area Complex Wild Horse Gather 10 (Nov. 2017) ("2017

Preliminary EA").

63.     The BLM explained that it would eliminate all of the wild horses from the

Caliente Complex, based on its determination that the removal of "all excess wild horses within

the Caliente HA Complex" is needed to meet the management directives of the 2008 Final

RMP—i.e., to implement its determination that there is not enough forage and habitat within the

entire 736,469 complex to sustain *any* horses, despite the fact that BLM continues to allow

grazing by thousands of cattle on those same public lands. 2017 Prelim. EA at 6.

64.     The BLM briefly considered, but eliminated from detailed examination any

alternatives that "would involve no removal of wild horses and would instead address the excess

wild horse numbers through the removal of livestock or reductions in livestock grazing

allocations within the Caliente Complex." 2017 Prelim. EA at 17. This alternative was dismissed

ostensibly because it was inconsistent with the 2008 Final RMP; it "would not achieve a thriving

natural ecological balance;" and in a bout of circular logic, it "would not meet the purpose and

need for [the] action," i.e., to remove all wild horses from the Caliente Complex. *Id.* The BLM

further explained that livestock grazing can only be reduced by the process described in the

regulations at 43 C.F.R. [part] 4100," which govern grazing administration. 2017 Prelim. EA at

17.  However, the BLM does have the authority to close or modify active livestock use. *See* 43

C.F.R. §§ 4110.3-2, -3. Despite the fact that the BLM has routinely adjusted the level of

livestock grazing and wild horse use on public lands through "Multiple Use Decisions," the

BLM here insisted that the only mechanism for changing the level of livestock use was through a

revision to the 2008 Final RMP. And, although the BLM acknowledged that the agency "is

authorized to remove livestock from HAs 'if necessary to provide habitat for wild horses or

burros, to implement herd management actions or to protect wild horses or burros from disease,

harassment or injury," *Id.* at 18 (quoting 43 C.F.R. § 4710.5), the BLM refused to utilize that

authority.

65. The BLM purported to examine the environmental effects of its action on the resources within the Caliente Complex, explaining that there is inadequate water and forage available for wild horse use. The BLM asserted, without any supporting data, that the elimination of wild horses from the range would: improve vegetation density, reproduction, and productivity, 2017 Prelim. EA at 33; decrease resource competition between wild horses and other wildlife, *id.* at 38; and improve forage conditions for livestock, *id.* at 42. Yet, the BLM did not consider whether the impacts to resources were at least partially attributable to the thousands of livestock the BLM authorizes to use those same public lands, despite acknowledging in the 2007 Proposed RMP/Final EIS that the loss of native vegetation is due largely to poor grazing management and altered fire regimes—not wild horse use. 2007 Proposed RMP/Final EIS at 3.5-8.

66. Several Plaintiffs and other members of the public submitted comments on the 2017 Preliminary EA. Plaintiffs AWHC and WWP submitted comments objecting to the BLM's permanent removal of wild horses from the Caliente Complex, focusing in particular on the BLM's failure to analyze the habitat impacts caused by livestock rather than wild horses, and the BLM's failure to consider the combined effects of livestock grazing and wild horse use in the Caliente Complex. AWHC and WWP explained that "[t]he EA and RMP fail to differentiate the range usage and damage from wild horses versus private livestock." 2018 Final EA at 97. AWHC and WWP therefore requested that the BLM "include detailed information on each grazing allotment within the Caliente Complex, including whether it has been assessed under the rangeland health regulations, and what the determinations for those assessments were." 2018 Final EA at 96. WWP specifically requested that the BLM provide details regarding the methods used "to measure between horse and cattle use," as well as the monitoring data showing the impacts from wild horses and livestock to the essential habitat components the BLM identified as

key to its analysis. *Id.* at 95. AWHC reminded the BLM that NEPA requires the final EA to

"fully disclose, describe and analyze specific and current range data, water availability, range

usage, and the agency's intended actions, and allow the public ample opportunity to review the

data and comment on the proposed action." *Id.* at 98.

67.     Plaintiffs AWHC and WWP also objected to the BLM's failure to consider

whether the BLM's management objectives could be achieved through alternatives to the

proposed action that would not require the BLM to take the drastic action of permanently

extirpating wild horses from the Caliente Complex, including the obvious alternative of reducing

livestock grazing that is permitted on these same lands. *See, e.g.*, 2018 Final EA at 97 (comments

stating that the EA and RMP fail to adequately consider alternatives that would reduce livestock

grazing and conduct range improvements to mitigate the need to eliminate wild horses from the

Caliente Complex); *see also id.* at 93 (explaining that "[r]educing livestock grazing is a very

reasonable alternative where the underlying problems include inadequate forage and degraded

ecological health"). AWHC and WWP further noted that while the BLM stated that the reduction

of grazing would be inconsistent with the 2008 Final RMP, the BLM failed to *explain* that

inconsistency. *Id.* at 93. Moreover, even if a reduction in livestock use was inconsistent with the

RMP, the BLM could issue a plan amendment. AWHC and WWP reminded the BLM of its

"broad authority to adjust grazing in exactly these circumstances to benefit wild horses" under

various authorities, including its own regulations, *see* 43 C.F.R. § 4710. *Id.*

68.     Plaintiff The Cloud Foundation also objected to the BLM's permanent removal of

horses from the Caliente Complex while continuing to permit grazing in the same area,

explaining that "removing every single one of these wild horses simply has no basis in fact or

science, contradicts the protections these animals were afforded by the [WHA], and will

senselessly add to the growing masses under government care and taxpayer expense." 2018 Final EA at 91. The Cloud Foundation further explained that, "[w]hile [it] understand[s] population control measures may need to enacted in the area[,] alleging that this land cannot sustain any wild horses when it can sustain thousands of livestock is unfounded illogical and inaccurate." *Id.* at 92.

69.     Other commenters likewise objected to the BLM's decision, and in particular noted that the BLM's resort to such a drastic action was not in compliance with the WHA's command that wild horse management activities must be limited to the "minimum feasible level." 2018 Final EA at 85.

### E.     The BLM's 2018 Final EA, FONSI, and Decision Record for the Caliente Herd Area Complex Wild Horse Gather

70.     On April 26, 2018, the BLM issued a Final EA, in which the agency adopted the proposed action from the preliminary EA with no alterations. *See* 2018 Final EA. One day later, on April 27, 2018, the BLM issued a FONSI and Decision Record ("DR") for the proposed gather and removal of all wild horses from the Caliente Complex. In the Final EA, FONSI and DR, the BLM determined that it would remove all wild horses from the Caliente Complex in order to implement the 2008 Final RMP. 2018 Final EA at 4. However, according to the agency, the Caliente Complex currently supports 1744 wild horses—i.e., more than ten times the high end of the AML that pre-dated the 2008 Final RMP.

71.     According to the agency's own records, the BLM currently authorizes over 4500 cows and sheep to graze in the Caliente Complex as a whole.

72.     Livestock and wild horses use the same forage and also compete for water and other resources on the range.

73.     In making its final decision, the BLM failed to explain how an action that results in the removal of all wild horses from public lands where wild horses have historically been present, while at the same time leaving the other chief use of those public lands—i.e., livestock grazing—untouched complies with its obligations under the WHA, NEPA, and FLPMA. Nor did the BLM explain how its action was consistent with its obligations "to protect and manage wild free-roaming horses" as "living symbols of the historic and pioneer spirit of the West," 16 U.S.C. § 1331, to manage wild horses as "an integral part of the natural system of the public lands," *id.*, and to conduct all wild horse management activities at the "minimal[] feasible level," *id.* § 1333(a).

74.     In making its final decision to remove all wild horses from the Caliente Complex in the 2008 Final RMP, as implemented through the 2018 Final EA, the BLM also failed to consider reasonable alternatives to, and the environmental effects of, its action on the resources present within the Caliente Complex. In particular, the BLM failed to consider alternatives that would achieve a thriving natural ecological balance in the Caliente Complex, including alternatives that would reduce the number of cattle and sheep authorized by the BLM to graze in the Complex, which would provide more habitat, forage, and water for wild horses and lessen or eliminate the need to extirpate wild horses from the Complex. In addition, the BLM failed to analyze the impacts of livestock on the health of the public lands, or whether the alleged adverse impacts in these areas are caused by livestock rather than by wild horses.

75.     The BLM also failed to explain, either in the 2008 Final RMP or in its recent 2018 FONSI and DR, why all of the wild horses must be removed from the 700,000-acre Caliente Complex on the ground that there is purportedly "inadequate" forage, water, habitat, and other resources available for wild horses, yet the agency has decided to continue to allow

livestock to remain in the same area at the same levels, particularly when the 2018 Final EA

conceded that significant livestock grazing occurs in the Caliente Complex as a whole, *see* 2018

Final EA at 41-42.

76. The BLM also failed to provide any information regarding its evaluation of the

grazing allotments in the Caliente Complex for meeting rangeland health standards. The BLM

did not provide any information regarding even those four allotments that had not yet been

evaluated in the 2008 Final RMP. Since such evaluations are conducted every ten years, the

BLM has either failed to conduct such an analysis for these allotments, or at least has failed to

provide the data and conclusions from its analysis. Without those data, it is impossible to

attribute the rangeland impacts to wild horse use, as opposed to livestock grazing. Therefore, the

BLM failed to support its decision—both in the 2008 Final RMP and the 2018 Final EA

implementing that decision—that that all horses must be eliminated from this area.

77. In making its final decision to remove all wild horses from the Caliente Complex

in the 2008 Final RMP, as implemented through the 2018 Final EA, the BLM failed to take a

"hard look" at other factors impacting range health—including livestock grazing, altered fire

regimes, the spread of noxious weeds, and climactic shifts—and how those factors affect the

balance of resource conditions and multiple uses in the Caliente Complex. For example, in the

2018 Final EA, the BLM conclusively insisted that lower wild horse numbers would increase

vegetation density and health; it did not discuss the additional pressures from invasive plant

species, climactic shifts, and livestock grazing, nor did it discuss how those factors are

impacting—and will continue to impact—the same vegetation resources.

78. In making its final decision to remove all wild horses from the Caliente Complex

in the 2008 Final RMP, as implemented through the 2018 Final EA, the BLM failed to respond

to Plaintiff organizations' and other public comments reminding the BLM that before removing horses from these public lands, the agency must analyze the impacts of livestock grazing, and consider the obvious alternative of reducing the number of livestock that can remain on these lands. Instead, despite the fact that the agency had failed to respond to such comments or consider such alternatives during the 2008 RMP revision, the agency in 2018 insisted that such alternatives could only be implemented through an RMP revision. Moreover, despite the fact that BLM's own regulations clearly provide authority to reduce or eliminate livestock grazing to protect wild horse use, BLM refused to consider this alternative, insisting—in direct contravention of its obligations under the WHA to "to protect and manage wild free-roaming horses" as "living symbols of the historic and pioneer spirit of the West," 16 U.S.C. § 1331, to manage wild horses as "an integral part of the natural system of the public lands," *id.*, and to conduct all wild horse management activities at the "minimal[] feasible level," *id.* § 1333(a), and its obligations under NEPA to explore all reasonable alternatives to, and impacts of its proposed action, 42 U.S.C. §§ 4331-4370f—that the WHA does not require the BLM to reduce livestock grazing to restore a thriving natural ecological balance. *Id.* at 94. While stating that it collects and possesses data regarding rangeland health, BLM also failed to respond to comments requesting such data, insisting that the purpose of the 2018 decision was to remove horses rather than consider the levels of horse and livestock grazing established in the 2008 RMP—despite the fact that the BLM had also refused to provide any such data to the public during the 2008 RMP revision process.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim I:  Violations Of The Wild Free-Roaming Horses And Burros Act

79.     The BLM's decision to permanently remove all of the wild horses from eight

HMAs in the Caliente Complex, but to allow ongoing grazing by thousands of cattle and sheep

in the same area, violates the mandate of the WHA that "free-roaming horses and burros shall be

protected" as "an integral part of the natural system of the public lands" in a "manner that is

designed to achieve and maintain a thriving natural ecological balance on the public lands." It is

also arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of

Section 706(2) of the APA.

80.     The BLM's decision to remove all federally protected wild horses while

continuing to allow substantial grazing by domestic livestock further violates the WHA's

command that "[a]ll management activities shall be at the minimal feasible level," and is

arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of

Section 706(2) of the APA.

81.     The BLM's decision to set the AML for wild horses in the 2008 RMP at zero for

the Caliente Complex, and to implement that decision in the 2018 FONSI and DR, without first

conducting an "an in-depth evaluation of intensive monitoring data or land health assessment . . .

. includ[ing] studies of grazing utilization, range ecological condition and trend, actual use, and

climate (weather) data [as well as] [p]opulation inventory, use patterns and animal distribution"

violates the BLM's own process for making AML determinations, BLM Handbook at 4.2.2.1,

4.2.2.2, and is also arbitrary and capricious and an abuse of discretion.

82.     The BLM's decision to permanently remove all wild horses from the Caliente

Complex without providing any legal or factual basis or data supporting that such drastic action

was necessary to achieve a thriving natural ecological balance violates the WHA's requirement

that the BLM may only remove from public lands "excess" horses as defined by the Wild Horse

Act. 16 U.S.C. §§ 1332(f); 1333(b)(2), and is also arbitrary, capricious, and an abuse of

discretion.

83.     By failing to provide "a detailed description of the analysis and the rationale used

in making the determination that a key habitat component either is (or is not) sufficient to

support healthy [wild horse and burro] populations and healthy rangelands over the long-term" in

the Caliente Complex in either the RMP or the gather decision, the BLM deviated from its own

internal procedures, BLM Handbook, app3 at 69, without explanation, and acted arbitrarily and

capriciously, and abused its discretion in violation of Section 706(2) of the APA.

84.     By failing to explain the agency's sudden reversal of position from one it has

maintained for nearly forty years—i.e., that wild horses must be maintained and protected in the

Caliente Complex—to one that calls for permanently removing all of the wild horses from the

area, particularly when the agency has failed to consider removing from these same public lands

many of the thousands of livestock that use the same forage, water, and habitat, the BLM has

violated its obligations under the WHA to "protect and manage" these "wild and free-roaming"

horses as "living symbols of the historic and pioneer spirit of the West," 16 U.S.C. § 1331;

manage wild horses "in the area where presently found, as an integral part of the natural system

of the public lands," *id.*; and ensure that "all management activities shall be at the minimal

feasible level." *Id.* § 1333(a). The BLM also acted arbitrarily and capriciously, and abused its

discretion in violation of Section 706(2) of the APA.

85.     The BLM's actions have injured Plaintiffs in the manner described in ¶¶ 6-20.

## Claim II: Violations Of The National Environmental Policy Act

**A.      The 2008 Final RMP**

86.      By failing in connection with the 2008 Final RMP to analyze the impacts of livestock grazing on the public lands in the Caliente Complex to determine whether, and to what extent, livestock, rather than wild horses, adversely affect the range's resources, the BLM violated NEPA and its implementing regulations.

87.      By failing to analyze the impacts of livestock grazing on the availability of forage, water, and other resources for horses in the Caliente Complex in adjusting wild horse AMLs, the BLM has failed to take a "hard look" at the effect of its chosen action, in violation of NEPA and its implementing regulations.

88.      By failing to analyze the impacts of livestock grazing on the availability of forage, water, and other resources for horses in the Caliente Complex, when it decided to permanently extirpate all wild horses from the Caliente Complex, which contains eight longstanding wild horse management areas where wild horse populations have existed since 1971, the BLM failed to take a "hard look" at the effect of its chosen action, in violation of NEPA and its implementing regulations.

89.      By failing to examine livestock grazing, the introduction and spread of noxious weeds, altered fire regimes, and climactic shifts as factors impacting the health and density of vegetation on the range, and whether those impacts could be addressed by other management options short of permanently extirpating all wild horses from the Caliente Complex, which contains eight longstanding wild horse management areas where wild horse populations have existed since 1971, the BLM failed to take a "hard look" at the effect of its chosen action, in violation of NEPA and its implementing regulations.

90.     By failing to consider and analyze reasonable alternatives to ultimately removing all of the horses from the Caliente Complex, including a reduction in BLM-authorized cattle and sheep grazing in the Complex that relies on similar forage, water, and other resources, the agency violated NEPA and its implementing regulations.

91.     By failing in connection with the 2008 Final RMP to provide the data to support its decision to remove all of the wild horses from the Caliente Complex, including data demonstrating that forage, water, and other habitat suitability measures are indeed inadequate to support a wild horse population, the BLM failed to take a "hard look" at the impacts of its chosen action, and failed to provide the public with a meaningful opportunity to participate in the environmental review process, in violation of NEPA and its implementing regulations.

92.     By failing to adequately respond to public comments—including those explaining that the BLM must analyze livestock grazing in the Caliente Complex before adjusting AMLs and must consider reducing livestock use in these areas before removing all of the horses from the Caliente Complex—the BLM has violated the public participation mandate of NEPA and its implementing regulations, and has acted arbitrarily and capriciously and abused its discretion pursuant to Section 706(2) of the Administrative Procedure Act ("APA").

93.     The BLM's actions have injured Plaintiffs in the manner described in ¶¶ 6-20.

**B.      The 2018 ROD, EA, and FONSI**

94.     By failing to analyze the impacts of livestock grazing versus wild horse use on the public lands in the Caliente Complex, to determine whether, and to what extent, livestock grazing rather than wild horses adversely affect the range's resources, the BLM violated NEPA and its implementing regulations.

95.     By failing to consider and analyze reasonable alternatives to removing all wild horses in Caliente Complex, including the reduction of livestock that can graze these areas, the agency violated NEPA and its implementing regulations.

96.     By again failing to provide the data to support its decision to remove all of the wild horses from the Caliente Complex—including data demonstrating that forage, water, and other habitat suitability measures are indeed inadequate to support a wild horse population; data concerning whether grazing allotments meet rangeland health standards; and data concerning the extent to which impacts to rangeland health are attributable to livestock grazing, as opposed to wild horse use—the BLM failed to take a "hard look" at the impacts of its chosen action, and failed to provide the public with a meaningful opportunity to participate in the environmental review process, in violation of NEPA and its implementing regulations.

97.     By failing to examine livestock grazing, the introduction and spread of noxious weeds, altered fire regimes, and climactic shifts as factors impacting the health and density of vegetation on the range, and whether those impacts could be addressed by other management options short of permanently extirpating all wild horses from the Caliente Complex, which contains eight longstanding wild horse management areas where wild horse populations have existed since 1971, the BLM failed to take a "hard look" at the effect of its chosen action, in violation of NEPA and its implementing regulations.

98.     By failing to respond to public comments—including those explaining that the BLM must analyze the impacts of livestock grazing in the Caliente Complex before making a determination about how many wild horses can be deemed "excess" horses subject to removal, and that the BLM must consider alternatives short of the drastic option of removing all wild horses from the Caliente Complex—the BLM has violated the public participation mandate of

NEPA and its implementing regulations, and its failure to respond is arbitrary, capricious, an abuse of discretion, and not in accordance with law pursuant to Section 706(2) of the Administrative Procedure Act ("APA").

99.     The BLM's actions have injured plaintiffs in the manner described in ¶¶ 6-20.

### Claim III: Violations Of The Administrative Procedure Act

100.     Plaintiffs hereby incorporate paragraphs 79-99, which allege violations of the APA, through the WHA and NEPA.

101.     By refusing to invoke its authority to "provide habitat for wild horses . . . or to protect wild horses . . . [by] clos[ing] appropriate areas of the public lands to grazing use by all or a particular kind of livestock"—and by failing to explain its reasons for not doing so—and by instead deciding to eliminate all wild horses from the Caliente Complex while at the same time continuing to allow thousands of cattle to remain in the same area, the BLM has violated its own regulations, 43 C.F.R. § 4710.5(a), and acted arbitrarily, capriciously, and abused its discretion in violation of Section 706(2) of the APA.

102.     The BLM's actions have injured plaintiffs in the manner described in ¶¶ 6-20.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter an Order:

1.     Declaring that Defendants have violated the Wild Free-Roaming Horses and Burros Act, the National Environmental Policy Act, and the Administrative Procedure Act;

2.     Enjoining Defendants from taking any further actions to round up and remove any wild horses from the Caliente Complex, until they have fully complied with the provisions of these statutes;

3.      Vacating the 2018 Final EA and the relevant portions of the 2008 Final RMP, i.e.,

those that pertain to the decision, implemented through the 2018 Final EA, to remove all wild

horses from the Caliente Complex and to set the wild horse AML for these areas at zero.

4.      Awarding plaintiffs their attorneys' fees and costs in this action; and

5.      Granting plaintiffs any further relief as the Court may deem just and proper.


Respectfully submitted,

*/s/ William S. Eubanks II*
William S. Eubanks II
D.C. Bar Number 987036
Meyer Glitzenstein & Eubanks LLP
2601 S. Lemay Avenue, Unit 7-240
Fort Collins, CO 80525
(970) 703-6060 / (202) 588-5049 (F)
beubanks@meyerglitz.com

William N. Lawton
D.C. Bar Number 1046604
Meyer Glitzenstein & Eubanks LLP
4115 Wisconsin Ave., NW, Ste. 210
Washington, D.C. 20016
(202) 588-5206 / (202) 588-5049 (F)
nlawton@meyerglitz.com

Counsel for Plaintiffs