| | |
|---|---|
| AMERICAN WILD HORSE CAMPAIGN, *et al.*, | |
| Plaintiffs, | Civil Action No. 18-1529 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| DAVID BERNHARDT, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

When adopting the Wild Free-Roaming Horses and Burros Act ("WHBA") in 1971, Congress recognized that "wild free-roaming horses . . . are living symbols of the historic and pioneer spirit of the West" and that these animals "contribute to the diversity of life forms within the Nation and enrich the lives of the American people." 16 U.S.C. § 1331. Yet, if not properly managed, wild horses can be destructive to the public lands they now inhabit. Wild free-roaming horses can consume resources necessary to the survival of native, including endangered, species, and can trample whatever is found underfoot, including indigenous plants and cultural artifacts. Unconcerned by the boundary lines drawn on maps, wild horses can stumble onto highways and into other dangerous areas, causing sometimes fatal injury to themselves or others. Additionally, when herds reach unsustainable population levels, wild horses may become malnourished and vulnerable to disease, especially during increasingly common periods of drought on Western public lands. These competing considerations frequently require removal of wild horses from

parts of the public lands so that the horses may be, *inter alia*, adopted or relocated to pastures in the Midwest.[1]

The Bureau of Land Management ("BLM") believes that removal of wild horses from an area of public lands in Nevada known as the "Caliente Complex" is currently necessary. BLM's position is not new. In 2008, BLM issued a land use plan that determined the Caliente Complex would not be managed for wild horses. Then, in 2009, BLM conducted a gather (*i.e.*, an effort to round-up, capture, and relocate wild horses) intended to remove all wild horses from the Complex. That effort, however, was not entirely successful, and today an estimated 1,744 wild horses are found in the Complex. Thus, in 2018 BLM determined that additional gathers are necessary.

The plaintiffs, three non-profit organizations and an individual concerned about the health and welfare of these wild horses, *see* Compl. ¶¶ 6–20, ECF No. 1, object to the new proposed gathers of wild horses in the Caliente Complex. Yet, the plaintiffs never challenged the 2008 decision to manage the Caliente Complex for no horses nor the gather conducted in 2009. Even now, the plaintiffs do not argue that the current wild horse population is sustainable

---

[1]    The WHBA prescribes what the government may do with removed horses. *See* 16 U.S.C. § 1333(b)(2). "All young and healthy horses" that are removed "are made available for adoption and transferred to private owners after the owners have demonstrated that the horses or burros will be treated humanely." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 16 n.1 (D.C. Cir. 2006) (citing 16 U.S.C. § 1333(b)(2)(B), (c)). "[O]ld, sick, or lame animals" are "destroyed in the most humane manner possible." 16 U.S.C. § 1333(b)(2)(A). The WHBA also permits the government to "destroy[]" young and healthy "excess wild free-roaming horses . . . for which an adoption demand by qualified individuals does not exist." *Id.* § 1333(b)(2)(C). "Congress," however, "has never appropriated funds for extermination, as opposed to ongoing maintenance, of excess horses even if not adopted." *In Def. of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1059 n.3 (9th Cir. 2014) (internal quotation marks omitted) (quoting *In Def. of Animals v. U.S. Dep't of the Interior*, 909 F. Supp. 2d 1178, 1190 (E.D. Cal. 2012)); *see, e.g.*, Pub. L. No. 116-94, 133 Stat. 2534, 2747 (2019) ("Amounts appropriated by this Act shall not be available for . . . (1) the destruction of any healthy, unadopted, and wild horse or burro under the jurisdiction of the Secretary concerned (including a contractor); or (2) the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product."). Thus, "[i]f not adopted, [the government] transfers the healthy excess animals to private long-term holding facilities, which consist of grassland pastures in the Midwest averaging approximately 10-11 acres per horse." *In Def. of Animals*, 751 F.3d at 1060 n.6; *see* Administrative Record ("AR") 10 ("All of the animals gathered [will] be removed and transported to [government] holding facilities where they [will] be prepared for adoption and/or sale to qualified individuals or maintained in off-range holding facilities . . . .").

or that agency action is unnecessary. *See* Pls.' Combined Opp'n Defs.' Cross-Mot. & Reply Supp. Pls.' Mot. ("Pls.' Opp'n") at 2–3, ECF No. 25. Nonetheless, the plaintiffs challenge BLM's 2018 decision that removal of all wild horses from the Caliente Complex is currently necessary, and belatedly challenge BLM's 2008 decision to manage the Caliente Complex for no horses. Put another way, the plaintiffs have initiated this lawsuit *ten years* after BLM made the key determination that the Caliente Complex cannot support wild horses. They assert violations of the WHBA, the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA").

Pending before the Court is the plaintiffs' motion for summary judgment, Mot. Summ. J. ("Pls.' Mot."), ECF No. 18, as well as the defendants' cross-motion, Defs.' Cross-Mot. Summ. J. & Opp'n Pls.' Mot. ("Defs.' Opp'n"), ECF No. 20. The plaintiffs' concern for wild horses appears to be heartfelt, but the time limit for challenging BLM's 2008 decision expired years ago, and in 2018, BLM complied with the WHBA and NEPA in determining that removal of all horses in the Caliente Complex is currently necessary. Thus, for the reasons detailed below, the plaintiffs' motion for summary judgment is denied, and the defendants' cross-motion is granted.[2]

## I.     BACKGROUND

The statutory framework governing the plaintiffs' claims is discussed first, followed by the details of the BLM actions at issue in this case.

---

[2] The plaintiffs "request[ed] an oral hearing on [their] motion, should the Court deem it helpful for resolution of this case." Pls.' Mot. Given the voluminous record and thorough briefing, a hearing is unnecessary. *See* LCvR 7(f) (authorizing oral hearings at "the discretion of the Court").

**A.      Statutory and Regulatory Framework**

**1.      The Wild Free-Roaming Horses and Burros Act**

In 1971, Congress enacted the WHBA to "protect[]" wild horses "from capture, branding, harassment, or death." 16 U.S.C. § 1331. To accomplish this goal, Congress declared that wild horses were "to be considered in the area where presently found, as an integral part of the natural system of the public lands." *Id.* Further, Congress tasked the Secretary of the Interior with "protect[ing] and manag[ing] wild free-roaming horses" found on public lands administered by BLM, authorizing the Secretary, *inter alia*, to "designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation." *Id.* § 1333(a).

"By 1978, however, Congress recognized that circumstances had changed." *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (Ginsburg, Ruth B., J.). The 1971 act was so successful that "the situation . . . appear[ed] to have reversed, and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Id.* (internal quotation mark omitted) (quoting H.R. REP. NO. 95-1122 (1978)). Therefore, "Congress struck a new balance . . . between protecting wild horses and competing interests in the resources of the public ranges," and "judged that prompt action was needed to redress the imbalance that had developed." *Id.* As the D.C. Circuit has explained, "[t]he main thrust of the 1978 amendments [was] to cut back on the protection the Act affords wild horses, and to reemphasize other uses of the natural resources wild horses consume." *Id.*

The WHBA continues to require that the Secretary of the Interior—here, acting through BLM—to conduct wild horse "management activities" "at the minimal feasible level," *i.e.*, with as little disruption in the horses' lives as possible. 16 U.S.C. § 1333(a). The law also now provides, though, that "[t]he Secretary shall manage wild free-roaming horses and burros in a

manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* "Where the Secretary determines . . . that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals," the Secretary must "immediately remove excess animals from the range so as to achieve appropriate management levels." *Id.* § 1333(b)(2).

To carry out its duty to manage the wild horses on the public lands under its control, BLM has created two types of areas: "herd management areas" ("HMAs") and "herd areas" ("HAs"). HMAs are managed for wild horses. "In each [HMA], the Bureau determines an 'appropriate management level' ('AML') for the wild horse and burro populations." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 15 (D.C. Cir. 2006). BLM defines AML "as 'the median number of adult wild horses or burros determined through BLM's planning process to be consistent with the objective of achieving and maintaining a thriving ecological balance and multiple-use relationship in a particular area.'" *Id.* By contrast, HAs are areas *not* managed for wild horses. *See* 43 C.F.R. § 4710.4 ("Management of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to herd areas."). Consequently, "[t]he AML of a given HA is typically zero." *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1274 n.5 (D. Utah 2017).

### 2.    The National Environmental Policy Act

NEPA represents "a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331). To this end, NEPA was created, in part, to "establish a set of 'action forcing' procedures requiring an environmental impact statement on any proposed major Federal action which could significantly affect the quality of the environment." S. REP. NO. 94-152, at 3

(1975) (recounting NEPA's "three major purposes" as part of discussion recommending NEPA amendment). Among these procedures, NEPA requires federal agencies, "to the fullest extent possible," to prepare and include an Environmental Impact Statement ("EIS") in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also Winter v. NRDC*, 555 U.S. 7, 15–16 (2008).[3] As part of this process, an agency must consider multiple factors, including "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(i)–(iii). "The statutory requirement that a federal agency contemplating a major action prepare such an [EIS] serves NEPA's 'action-forcing' purpose in two important respects," *Robertson*, 490 U.S. at 349, by (1) "ensur[ing] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and (2) "guarantee[ing] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Blue Ridge Envtl. Def. League v. NRC*, 716 F.3d 183, 188 (D.C. Cir. 2013) (quoting *Robertson*, 490 U.S. at 349),

"The Council of Environmental Quality (CEQ), established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide federal agencies in determining what actions are subject to" the EIS requirement. *Dep't of Transp. v. Pub. Citizen*,

---

[3]     "Human environment" has been "interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. "In the context of wild horse gathers," courts have "interpreted 'human environment' to encompass 'not solely [the environmental impact] on the rangelands, but [the environmental impact] on the horses as well.'" *In Def. of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1067 n.22 (9th Cir. 2014) (alterations in original) (quoting *Am. Horse Prot. Ass'n v. Andrus*, 608 F.2d 811, 814 (9th Cir. 1979)).

541 U.S. 752, 757 (2004) (citing 40 C.F.R. § 1500.3).  Under these regulations, an agency may

prepare "a more limited document, an Environmental Assessment (EA), if the agency's proposed

action neither is categorically excluded from the requirement to produce an EIS nor would

clearly require the production of an EIS." *Id.* (citing 40 C.F.R. § 1501.4(a), (b)).  An EA is a

"'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for

determining whether to prepare an [EIS].'" *Id.* (alterations in original) (quoting 40 C.F.R.

§ 1508.9(a)).  If, after conducting an EA, the agency determines that an EIS is not required under

the applicable regulations, "it must issue a 'finding of no significant impact' (FONSI), which

briefly presents the reasons why the proposed agency action will not have a significant impact on

the human environment." *Id.* at 757–58 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).

       Notably, NEPA is "'essentially procedural,'" intended only "to ensure 'fully informed

and well-considered decision[s]' by federal agencies." *Del. Riverkeeper Network v. FERC*, 753

F.3d 1304, 1309–10 (D.C. Cir. 2014) (alteration in original) (quoting *Vt. Yankee Nuclear Power

Corp. v. NRDC*, 435 U.S. 519, 558 (1978)).  In other words, NEPA "does not mandate particular

results in order to accomplish its ends," *id.* at 1310 (internal quotation mark omitted) (quoting

*Pub. Citizen*, 541 U.S. at 756–57), "require agencies to elevate environmental concerns over

other appropriate considerations," *WildEarth Guardians v. Jewell*, 738 F.3d 298, 303 (D.C. Cir.

2013) (quoting *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)), or necessarily require

"the best decision," *id*. (internal quotation mark omitted) (quoting *New York v. NRC*, 681 F.3d

471, 476 (D.C. Cir. 2012)); *see also Sierra Club v. FERC*, 827 F.3d 59, 68 (D.C. Cir. 2016) ("As

a procedural statute, NEPA does not mandate any particular outcome.").  "NEPA is 'not a

suitable vehicle' for airing grievances about the substantive policies adopted by an agency, as

'NEPA was not intended to resolve fundamental policy disputes.'" *Grunewald v. Jarvis*, 776

F.3d 893, 903 (D.C. Cir. 2015) (quoting *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 886 (D.C. Cir. 1987)).

## B.      Factual Background

This case concerns wild horses located in the Caliente Complex, an area of public lands located near the town of Caliente, Nevada.  AR 3.[4]  The Complex "encompasses approximately 911,892 acres," *id.*, currently managed by BLM as nine separate HAs, AR 4.  The Complex is itself part of a larger area of public (and small amount of private) lands known as the "Ely District," which contains 13,927,352 acres.  AR 1387.

The history of wild horse management in the Caliente Complex dates back at least to 1979.  At that time, BLM managed the nine areas of the Caliente Complex as HMAs rather than as HAs, and the wild horse population in the Complex was estimated to be 1,011 horses.  *See* AR 4917.  BLM determined, however, that "[l]ack of adequate watering facilities" in the Complex "[was] a problem for some of the wild horses," AR 4922, and therefore instituted a plan to reduce wild horse population to 497 by 1980, AR 4814.  Again in 1999, BLM determined that wild horses were overusing resources in the Caliente Complex's "Mormon Mountains" HMA, so BLM set the Mormon Mountains AML at zero horses and converted the area into an HA, AR Suppl. at 6, leaving eight remaining HMAs in the Complex.

In 2003, BLM made the first in a series of decisions leading to the current challenge.  That year, BLM issued a Notice of Wild Horse Management Decision and FONSI (collectively,

---

[4]      The defendants filed a certified index of the administrative record, in accordance with Local Civil Rule 7(n), *see* Notice of Filing the Certified List of AR Contents, ECF No. 17, and then supplemented the record with a single document, *see* Min. Order (May 28, 2019) (granting the defendants' request to supplement record, as to which the plaintiffs took no position), bringing the administrative record to a total of 10,237 pages.  Consistent with Local Civil Rule 7(n), the portions of the administrative record cited or otherwise relied upon in the parties' briefing have been separately docketed.  *See* J.A. of AR, ECF No. 31.  The pages of the joint appendix were not separately numbered, so "AR" citations refer to the page numbers of both the Joint Appendix and the full, undocketed administrative record, except that the supplemental document was not given "AR" page numbers and is thus cited as a stand-alone document.  *See* AR Suppl., ECF No. 19-2.

"2003 Management Decision") that again lowered AMLs in the Caliente Complex. AR 5836,

5841. In lowering the AMLs, the EA that accompanied the 2003 Management Decision

identified suitability for wild horses as a "primary concern" in the Caliente Complex. AR 5859.

The Caliente Complex is described as a region "where water sources are limited and

unpredictable," "forage productivity varies wildly among years," and "[t]he extreme climate,

especially harsh temperatures in the summer[,]" can "create resource issues as well as animal

humanity issues." *Id.* Consequently, the 2003 Management Decision determined that all but one

of the Caliente Complex's remaining HMAs should be managed for zero horses. AR 5840–41.

At the same time, though, the 2003 Management Decision concluded that "[t]he decision to not

manage for wild horses . . . should be a land use plan decision." AR 5841. Accordingly, the

2003 Management Decision set nominal AMLs for the Complex HMAs rather than lower the

AMLs all the way down to zero, reserving the latter action for a later date. *See id.* The plaintiffs

did not challenge the 2003 Management Decision.

     In 2003, BLM also began work on "a land use plan—what BLM regulations call a

'resource management plan' [('RMP')]," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 59

(2004)—for the entire Ely District, including the Caliente Complex. In accordance with the

2003 Management Decision, BLM made assessment of the AMLs in the Caliente Complex part

of the land use planning process. *See* AR 2814. Following years of review, analysis, and public

engagement, *see* AR 1393–94, 2681–82, BLM completed the RMP for the Ely District, issuing

the Final EIS ("2007 EIS") in 2007, AR 2666, and the Record of Decision and Approved RMP

(collectively, "2008 RMP") in 2008, AR 1380. As foreshadowed by the 2003 Management

Decision, the 2008 RMP converted the eight remaining HMAs in the Caliente Complex into HAs

("2008 RMP HA determination"). AR 1451. By so doing, the 2008 RMP set an effective AML of zero for the entire Complex. *See* 43 C.F.R. § 4710.4.[5]

In 2009, BLM implemented the 2008 RMP HA determination. After completing an environmental assessment, BLM concluded that the presence of wild horses was inconsistent with achieving and maintaining a thriving ecological balance in the Caliente Complex. AR 5552. Accordingly, BLM decided to conduct a gather ("2009 Gather Decision") intended to remove all wild horses from the Complex. *See id.* The plaintiffs did not challenge the 2009 Gather Decision and, before this suit, had never challenged the 2008 RMP determination to convert the remaining HMAs in the Caliente Complex into HAs.

Although BLM removed 308 wild horses from the Caliente Complex in 2009, *see* AR 7293–94, by 2017, BLM estimated that 1,744 wild horses remained in the Complex, AR 111, and, further, that if no action were taken, the wild horse population in the Complex would increase by 20% each year, AR 113. In light of this overpopulation of wild horses, BLM issued a preliminary EA in November 2017 for a plan to conduct a series of gathers "to protect wild horse health, reduce and mitigate public safety concerns caused by wild horses residing along major roadways within and outside HA boundaries," and "prevent further damage to the range resulting from the . . . overpopulation while achieving and maintaining a thriving natural ecological balance and multiple-use relationship within the area." AR 104, 111. After receiving and responding to public comments concerning the draft EA, *see* AR 82–100, BLM issued a final EA, AR 1, in April 2018, followed shortly thereafter by the issuance of a FONSI and Record of Decision (collectively, "2018 Gather Decision") on April 27, 2018 authorizing the

---

[5]     The parties do not dispute that converting an HMA into an HA is equivalent to setting an AML of zero for the purposes of BLM's relevant obligations under the WHBA and NEPA. *See* Defs.' Opp'n at 41 n.22; Pls.' Opp'n at 13.

proposed gathers, AR 101, 103. In the 2018 Gather Decision, BLM concluded that removal of all the wild horses within the Caliente Complex is "necessary to achieve a thriving natural ecological balance" in that area. AR 103.

Pursuant to the 2018 Gather Decision, BLM plans to conduct an initial gather to remove most of the wild horses from the Caliente Complex, and then to conduct additional periodic gathers over the subsequent ten years to remove any wild horses that remain. *Id.* Although this plan will, if successful, ultimately result in the removal of all wild horses from the Caliente Complex, wild horse herds will continue to exist in six other HMAs within the larger Ely District. *See* AR 3502–03. BLM has not yet set a date for the 2018 Gather Decision's initial gather. Defs.' Opp'n at 9.

**C.     Procedural Background**

Approximately ten years after BLM issued the 2008 RMP and two months after BLM issued the 2018 Gather Decision, the plaintiffs initiated this suit on June 27, 2018, asserting three claims for relief: Claim I alleges violations of the WHBA, Compl. ¶¶ 79–85; Claim II alleges NEPA violations, *id.* ¶¶ 86–99; and Claim III alleges "violations of the APA, through the WHA and NEPA," *id.* ¶ 100; *see id.* ¶¶ 100–02. These claims challenge the validity of both the 2008 RMP and the 2018 Gather Decision and seek relief in the form of an order, *inter alia*, "[v]acating the 2018 [Gather Decision] and the relevant portions of the 2008 Final RMP, i.e., those that pertain to the decision, implemented through the 2018 [Gather Decision], to remove all wild horses from the Caliente Complex and to set the wild horse AML for these areas at zero." *Id.* at 37 (prayer for relief).

In accordance with the parties' proposed schedule, a scheduling order was entered for the parties' filing of cross-motions for summary judgment, *see* Min. Order (Sept. 24, 2018), and

after extensions granted at the parties' requests, briefing was completed on October 25, 2019, with the AR joint appendix filed on November 6, 2019.  The parties' cross-motions for summary judgment are now ripe for resolution.

## II.  LEGAL STANDARD

Both the WHBA and NEPA lack a specific statutory review provision and, consequently, challenges alleging violations of these statutes are brought pursuant to the APA.  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006); *see also, e.g.*, *Indian River Cty. v. U.S. Dep't of Transp.*, 945 F.3d 515, 520 (D.C. Cir. 2019) (reviewing NEPA challenge brought pursuant to the APA).  Under the APA, agency action must be held "unlawful and set aside" when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In APA cases involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal.  The entire case on review is a question of law."  *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1240 (D.C. Cir. 2011) (internal quotation mark omitted) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  Accordingly, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions."  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of*

*Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting, in APA case, that "determining the facts is generally the agency's responsibility, not ours").

## III. DISCUSSION

The defendants posit that assessment of the merits of the plaintiffs' claims is entirely precluded because the plaintiffs lack standing and their claims are untimely. The plaintiffs, for their part, vigorously contest these jurisdictional obstacles and seek a determination that both the 2008 RMP and the 2018 Gather Decision violate the WHBA and NEPA. The defendants' threshold jurisdictional challenges are addressed first, followed by review of what remains of the plaintiffs' WHBA and NEPA claims.

### A. Standing

"The Constitution limits the 'judicial Power of the United States' to 'Cases' or 'Controversies,'" *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 612 (D.C. Cir. 2019) (quoting U.S. CONST. art. III, §§ 1–2), "and the requirement of standing is 'rooted in the traditional understanding of a case or controversy,'" *id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). To establish constitutional standing, a "plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Narragansett Indian Tribal Historic Pres. Office v. FERC*, No. 19-1009, 2020 WL 593866, at *2 (D.C. Cir. Feb. 7, 2020) (same). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561; *see also Twin Rivers Paper Co.*, 934 F.3d at 613 (same).

In cases such as this one where federal action affects wildlife, "[i]t is clear that the person who observes . . . a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist." *Lujan*, 504 U.S. at 566. Nevertheless, a plaintiff must provide more than "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—[to] support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require." *Id.* at 564. "[E]ach element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation.'" *Bennett v. Spear*, 520 U.S. 154, 167–68 (1997) (quoting *Lujan*, 504 U.S. at 561). "[T]o survive a motion for summary judgment," a plaintiff may establish standing by affidavit. *Id.* at 168.

The defendants assert that the plaintiffs "have not shown that [they] will suffer an 'injury-in-fact' that is 'actual or imminent,'" Defs.' Opp'n at 11 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011)), because "none of Plaintiffs' declarants express 'concrete' plans to visit the Complex in the future," *id.* "The declaration of [plaintiff] Laura Cunningham," the defendants acknowledge, "gets the closest" to satisfying the relevant standard, as Cunningham claims "that she 'has concrete plans to return to the areas encompassed by the Caliente Complex in the near future.'" *Id.* (quoting Decl. of Laura Cunningham ¶ 6, ECF No. 18-2). Nevertheless, the defendants contend that Cunningham's declaration falls short because it fails to "provid[e] any further detail on *when* those concrete plans are for." *Id.* (emphasis in original).

In response to the defendants' assertion, the plaintiffs have provided a supplemental declaration from Cunningham "clarifying her travel plans." Pls.' Opp'n at 38. Cunningham

identifies a "camp and hike" she planned to take "at the end of August 2019" in the "Clover Mountain Wilderness Area . . . adjacent to the public lands that comprise the Caliente Complex," and she states that "[o]n [her] way to the Wilderness Area," she intended to "visit the Caliente Complex to view and photograph the wildlife that reside there, including the wild horses that [BLM] intends to permanently eliminate from these public lands."  Suppl. Decl. of Laura Cunningham ¶ 2, ECF No. 25-1.[6]  Notably, in their reply the defendants raise no argument that Cunningham's supplemental declaration fails to satisfy the relevant standard, and although this Court has an "independent obligation to assure [itself] that standing exists," *Exelon Corp. v. FERC*, 911 F.3d 1236, 1240 (D.C. Cir. 2018) (internal quotation marks omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)), the defendants' silence underscores that Cunningham does, indeed, have standing.  Given this conclusion, whether any other plaintiff has standing need not be considered.  *See Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619–20 (D.C. Cir. 2020) (noting that "where parties seek the same relief," "only one party" is required "to have standing").

Accordingly, the defendants' challenge to the plaintiffs' standing is rejected.

## B.    Timeliness

"Unless another statute provides otherwise, civil claims against the United States— including those brought pursuant to the APA—are subject to the statute of limitations contained in 28 U.S.C. § 2401, which allows for civil actions against the United States so long as 'the complaint is filed within six years after the right of action first accrues.'"  *Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014) (quoting 28 U.S.C. § 2401).  As the D.C. Circuit has "long held," § 2401's six-year statute of limitations "'creates a jurisdictional condition attached to the

---

[6]    That August 2019 passed while the parties briefed this matter is of no moment, as "standing is assessed at the time of filing."  *Barker v. Conroy*, 921 F.3d 1118, 1125 (D.C. Cir. 2019).

government's waiver of sovereign immunity.'" *Id.* (quoting *P & V Enters. v. U.S. Army Corps. of Eng'rs*, 516 F.3d 1021, 1026 (D.C. Cir. 2008)); *see also Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 55 (D.C. Cir. 1987) (same).

The defendants argue that § 2401 bars the plaintiffs' claims because the plaintiffs, who brought suit in 2018, "challenge . . . a decision originally implemented over ten years ago"—*i.e.*, the 2008 RMP HA determination for the Caliente Complex, which converted all HMAs in the Complex into HAs and set an effective AML of zero wild horses for the Complex, and which was implemented by the 2009 Gather Decision. Defs.' Opp'n at 13. In the defendants' view, the plaintiffs' untimeliness should bar not just the plaintiffs' challenge to the 2008 RMP HA determination, but also the plaintiffs' challenge to the 2018 Gather Decision, because "at bottom, all of [the plaintiffs'] claims are ultimately attacking the underlying decision to not manage the Complex for horses." *Id.* The plaintiffs counter that "a challenge to a site-specific decision"— here, the 2018 Gather Decision—"may also legitimately challenge the programmatic plan"— here, the 2008 RMP—"that 'play[ed] a causal role' in the development of the site-specific action," and thus their seemingly untimely challenge to the 2008 RMP may proceed through their timely challenge to the 2018 Gather Decision. Pls.' Opp'n at 42 n.14 (alteration in original) (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998)). Further, the plaintiffs maintain that the 2018 Gather Decision was "not a mere implementation" of the 2008 RMP HA determination, *id.* at 41 n.13, but rather was effectively a reassessment of that decision, rendering challenges to it once again timely, *see id.*

This dispute over the timeliness of the plaintiffs' claims, in whole or part, raises three distinct issues about (1) when the right of action to challenge the 2008 RMP HA determination accrued; (2) whether BLM reopened the 2008 RMP HA determination when making the 2018

Gather Decision; and (3) whether the plaintiffs have raised a timely challenge to the 2018 Gather Decision, even if a challenge to the 2008 RMP HA determination is time-barred. Each issue is addressed in turn.[7]

### 1. Accrual

#### a. The Date of Accrual Turns on Whether the 2008 RMP HA Determination Constituted Final Agency Action

Ordinarily, a "right of action" under the APA "first accrues on the date of the final agency action." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 342 (D.C. Cir. 2018) (internal quotation marks omitted) (quoting *Harris v. FAA*, 353 F.3d 1006, 1010 (D.C. Cir. 2004)). "[A] time limitation on petitions for judicial review," however, "can run only against challenges ripe for review." *Fed. Express Corp. v. Mineta*, 373 F.3d 112, 119 (D.C. Cir. 2004) (internal quotation marks omitted) (quoting *Balt. Gas & Elec. Co. v. ICC*, 672 F.2d 146, 149 (D.C. Cir. 1982)).

The defendants peg accrual of the limitations period for the 2008 RMP HA determination to the issuance of the 2009 Gather Decision when "BLM's decision to not manage the [Caliente] Complex for wild horses" was first "implemented." Defs.' Reply at 2. The plaintiffs do not contest that the 2008 RMP's conversion of the Caliente Complex HMAs into HAs could have been challenged as part of a suit challenging the 2009 Gather Decision. *See* Pls.' Opp'n at 41–42. Nonetheless, the plaintiffs press that their suit is timely because the 2018 Gather Decision is also "a final agency action that itself is subject to judicial review," *id.* at 41, and a plaintiff challenging "a site-specific decision" may challenge "the programmatic plan that 'play[ed] a

---

[7]   The defendants argue, in the alternative, that the plaintiffs' challenge is barred by laches. Defs.' Opp'n at 13; Defs.' Reply Supp. Defs.' Cross-Mot. & Opp'n ("Defs.' Reply") at 2, ECF No. 30. This argument fails because, "in face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 679 (2014).

causal role' in the development of the site-specific action," *id.* at 42 n.14 (alteration in original) (quoting *Ohio Forestry Ass'n*, 523 U.S. at 734).

The plaintiffs' argument appears grounded in the text of 5 U.S.C. § 704, which authorizes *direct* judicial review of "final agency action," but permits review of "preliminary, procedural, or intermediate agency action" only "on the review of the final agency action." 5 U.S.C. § 704.[8] In the plaintiffs' reasoning, § 704 allows for review of *any* "preliminary" agency action leading to a challenged final action, and the 2008 RMP HA determination is reviewable now as a preliminary step toward the 2018 Gather Decision. This analysis suffers from a fatal flaw. As explained next, the 2008 RMP HA determination was not preliminary, but rather was itself final agency action.[9]

### b. The 2008 RMP HA Determination was Final Agency Action

"To be final, an [agency] action must (1) 'mark[] the consummation of the agency's decisionmaking process' and (2) be one by which 'rights or obligations have been determined, or from which legal consequences will flow.'" *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 620 (D.C. Cir. 2020) (second alteration in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). These conditions—often referred to as the "*Bennett* prongs"—are addressed *seriatim*.

---

[8]     The relevant text of 5 U.S.C. § 704 reads as follows: "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."

[9]     The plaintiffs cite *Ohio Forestry* for the proposition that a programmatic plan may be challenged through any site-specific implementation, regardless of the passage of time between the plan's adoption and implementation. *See* Pls.' Opp'n at 42 n.14 (citing *Ohio Forestry*, 523 U.S. at 732–34). *Ohio Forestry*, however, merely held that a challenge to a land use plan was not *ripe* until a site-specific action made the plaintiffs' harm "more imminent and more certain." 523 U.S. at 734. *Ohio Forestry* said nothing about whether land use plans constitute "final" or merely "preliminary" agency action, nor did the Supreme Court suggest that challenges to land use plans are immune to statute-of-limitations defenses once finality and ripeness are established if the requisite limitations period has lapsed. Thus, *Ohio Forestry* provides no authority for the plaintiffs' theory that the statute of limitations may be avoided here.

### i.     Prong 1: The 2008 RMP HA Determination Consummated BLM's Decisionmaking Process

"In evaluating the first *Bennett* prong," a court must "consider[] whether the action is 'informal, or only the ruling of a subordinate official, or tentative.'"  *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967)).  "The decisionmaking processes set out in an agency's governing statutes and regulations are key to determining whether an action . . . represents the culmination of that agency's consideration of an issue."  *Id.*

Here, the conversion of the Caliente Complex HMAs into HAs was the product of a lengthy decisionmaking process.  As early as the 2003 Management Decision, BLM identified that converting remaining HMAs in the Caliente Complex into HAs was under consideration.  *See* AR 5841.  BLM determined, however, that pursuant to its regulations and its handbook, such a conversion should only occur as part of a comprehensive land use plan.  *See id.*; *see also* 43 C.F.R. § 4710.1 ("Management activities affecting wild horses and burros, including the establishment of herd management areas, shall be in accordance with approved land use plans . . . ."); U.S. BUREAU OF LAND MGMT., DEP'T OF THE INTERIOR, H-1601-1, LAND USE PLANNING HANDBOOK, App. C at 7 (2005) [hereinafter BLM HANDBOOK] (explaining that "herd management area designation" is a "land use plan decision[]" (capitalization altered)).  Consistent with this determination, BLM considered the conversion issue as part of its already-ongoing effort to prepare an RMP for the Ely District, *see* AR 1393–94, relying on, *inter alia*, "monitoring data, horse census data, emergency horse gather data, and input from the BLM wildlife, range management, and wild horse specialists" that had been initially obtained and considered as part of the AML evaluation made in the 2003 Management Decision, AR 5925; *see* AR 3149–51.  In 2005, BLM published a draft RMP and EIS, 70 Fed. Reg. 43,902 (July 29,

2005), which was subject to a 120-day public comment period and addressed at public meetings in six locations in Nevada, AR 2681–82. Then, in 2007, BLM published a proposed RMP and EIS, AR 2666, which was subject to both a thirty-day protest period—during which plaintiff Western Watersheds Project submitted comments concerning the HA conversions, Compl. ¶ 11—and a sixty-day governor's consistency review. AR 1382–83. After responding to comments submitted during the thirty-day protest period, *see* AR 1394, BLM officially issued the 2008 RMP, converting the eight remaining HMAs in the Caliente Complex into HAs, *see* AR 1380.

Once BLM issued the 2008 RMP, this lengthy decisionmaking process was at an end. *See, e.g.*, *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (concluding that the first *Bennett* prong was met when decision was "a considered determination, based on a thorough examination of," among other things, "recent biological studies [and] elephant population data"). Indeed, the 2008 RMP's Record of Decision explained the RMP was "the final decision for the land use plan decisions described in the Approved Plan" and that "[n]o further administrative remedies [were] available . . . for these land use plan decisions," AR 1389, plainly indicating that the decision would "not [be] revisited" as the "process move[d] forward," *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1814 (2016). BLM thus made clear that the 2008 RMP was BLM's "last word" about the AMLs in the Caliente Complex. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (quoting *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 586 (1980)); *see, e.g.*, *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (determining that consummation had occurred when agency decision was "not subject to further agency review").

True, the 2008 RMP HA determination did not mark the end of BLM's consideration of issues related to the management of wild horses in the Caliente Complex. For instance, BLM

remained free, in conformance with applicable statutes and regulations, to amend the 2008 RMP and reverse its decision to manage the Caliente Complex for zero horses. *See, e.g.*, 43 C.F.R. § 1610.5-3(c) ("If a proposed action is not in conformance[ with an approved RMP], . . . consideration [of the proposed action] shall be through a plan amendment in accordance with the provisions of . . . this title."). Additionally, BLM retained discretion over *how* to implement the 2008 RMP and achieve the AML. *See* 16 U.S.C. § 1333(b)(1) (authorizing BLM to "achieve[]" "appropriate management levels" "by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)"). Yet, BLM's ability to amend the 2008 RMP did not vitiate the finality of the 2008 RMP HA determination, because "[t]he mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal." *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) (omission in original) (internal quotation mark omitted) (quoting *Sackett*, 566 U.S. at 127). Moreover, although BLM retained discretion over how to implement the 2008 RMP, courts have repeatedly recognized that agency action can be final as to one issue (here, the Caliente Complex's effective AML), even if other issues (such as how to achieve the AML) remain open for later resolution. *See, e.g.*, *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1032 (D.C. Cir. 2016) (observing that "[t]he possibility that the agency might not bring an action for penalties . . . did not rob the administrative order in *Sackett* of its [finality]" (citing *Sackett*, 566 U.S. at 126–28)).

In sum, the 2008 RMP definitively determined that the Caliente Complex would not be managed for wild horses, satisfying *Bennett*'s first prong.

**Prong 2: Legal Consequences Flow from the 2008 RMP HA Determination**

As to *Bennett*'s second prong, "[t]he law in this area is hardly crisp," "lack[ing] many 'self-implementing, bright-line rule[s].'" *Rhea Lana, Inc.*, 824 F.3d at 1027 (third alteration in original) (quoting *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005)). Both the Supreme Court and the D.C. Circuit, however, have made clear that "determining whether 'legal consequences will flow' from an agency action is a 'pragmatic' inquiry." *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019) (quoting *Hawkes*, 136 S. Ct. at 1815). When conducting this "pragmatic" and "flexible" inquiry, *Rhea Lana*, 824 F.3d at 1027 (internal quotation marks omitted) (quoting *Nat'l Ass'n of Home Builders*, 417 F.3d at 1279), a court must look to "the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it," *Ipsen*, 943 F.3d at 956 (internal quotation mark omitted) (quoting *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019)).

Notably, *Bennett*'s second prong is satisfied by legal consequences that affect only the agency itself. *See, e.g.*, *Sierra Club v. Trump*, 929 F.3d 670, 698 n.23 (9th Cir. 2019) ("[T]he question we must ask in determining finality is whether the agency action imposes obligations on the agency, not whether it imposes obligations on Plaintiffs."). *Bennett*'s holding illustrates this point. There, the Supreme Court considered "a challenge to a biological opinion issued by the Fish and Wildlife Service in accordance with the Endangered Species Act . . . concerning . . . [a] project's impact on two varieties of endangered fish." *Bennett*, 520 U.S. at 157. The biological opinion did not bind the petitioners who challenged the agency action, nor subject the petitioners to potential legal liability or alter their legal rights. Nevertheless, the Supreme Court determined that the biological opinion had "direct and appreciable legal consequences" by "alter[ing] the

legal regime to which the *action agency* [was] subject, authorizing [the agency] to take the endangered species if (but only if) it complie[d] with . . . prescribed conditions." *Id.* at 178 (emphasis added); *see also*, *e.g.*, *NRDC v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) ("[T]he Guidance binds *EPA regional directors* and thus qualifies as final agency action." (emphasis added)).

The reasoning that applied in *Bennett* applies here: Legal consequences flowed from the decision to convert the remaining Caliente Complex HMAs into HAs and set an effective AML of zero for the Complex because that decision "alter[ed] the legal regime to which . . . agency action is subject." *Bennett*, 520 U.S. at 178. As a general matter, "[r]esource management plans are designed to guide and *control* future management actions." 43 C.F.R. § 1601.0-2 (emphasis added). In accordance with this design, an RMP "constrains" BLM by "prevent[ing] BLM from taking actions inconsistent with the provisions of [the] land use plan." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69, 71 (2004). On this point, the Supreme Court has made clear that, "[u]nless and until the plan is amended, [inconsistent] actions can be set aside as contrary to law pursuant to 5 U.S.C. § 706(2)." *Id.* at 69.

AML determinations made pursuant to land use plans are no exception to this general rule. When deciding whether to conduct a wild horse gather, "BLM is required . . . to conform to [land use] plans" in effect. *Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 456 (S.D.N.Y. 2010) (citing 43 C.F.R. §§ 1601.0-5(b), 1610.5-3(a)). Such conformance is compelled by regulation, *see, e.g.*, 43 C.F.R. § 4710.1, as well as by the WHBA itself, which mandates that BLM "determine[] 'excess animals' through the use of AML levels," *In Def. of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1063 (9th Cir. 2014) (citing 16 U.S.C. § 1333(b)(2)). Moreover, like in *Bennett*, BLM "disregard[s]" AML determinations "at its own peril (and that

of its employees),” 520 U.S. at 170, for “any person who . . . willfully removes or attempts to remove a wild free-roaming horse or burro from the public lands, without authority from the Secretary . . . shall be subject to a fine of not more than $2,000, or imprisonment for not more than one year, or both,” 16 U.S.C. § 1338(a)(1); *see Bennett*, 520 U.S. at 170 (explaining that “any person” who disregarded the biological opinion at issue could be “subject to substantial civil and criminal penalties, including imprisonment” (internal quotation marks omitted)).

Thus, once an AML has been set by an RMP, “discretion” previously afforded to BLM to determine the wild horse population for that region has been “withdrawn.” *NRDC*, 643 F.3d at 319. That legal consequence satisfies *Bennett*’s second prong. *See id.* at 320 (determining that agency’s issuance of guidance was a final agency action because “[t]he permissibility of alternatives” under the applicable regulatory scheme was “now a closed question, and the Guidance [left] to future rulemakings only the issue of whether a specific proposed alternative” was satisfactory). This conclusion fully comports with that of other courts, which have recognized that land use plans constitute final agency action to the extent they limit an agency’s future options. *See, e.g.*, *Or. Nat. Desert Ass’n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118 (9th Cir. 2010) (concluding that adoption of an EIS for a land use plan in a record of decision constituted final agency action); *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 964–65 (6th Cir. 2009) (same); *W. Org. of Res. Councils v. U.S. Bureau of Land Mgmt.*, No. CV 16-21-GF-BMM, 2017 WL 374705, at *2 (D. Mont. Jan. 25, 2017) (determining that record of decision that “approved RMP revisions . . . and . . . amendments” “represent[ed] final agency action which is subject to judicial review”); *S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099, 1103 (D. Utah 2013) (“The final agency action at issue in this case is the BLM’s [record of decision] approving the Richfield RMP and Travel Plan.”); *Stout v. U.S. Forest Serv.*, Civil No.

09-152-HA, 2011 WL 867775, at *6 (D. Or. Mar. 10, 2011) ("[I]f an agency's future actions

must be consistent with the plan, and the litigant's grievance is with the overall plan, he or she

may challenge the approval of the plan . . . ."); *Soda Mountain Wilderness Council v. Norton*,

424 F. Supp. 2d 1241, 1259–60 (E.D. Cal. 2006) (determining that amendment to land use plan

was final agency action).[10]

* * *

The 2008 RMP decision not to manage the Caliente Complex for wild horses constituted

final agency action, and any challenges to that 2008 RMP HA determination were ripe by, at the

latest, 2009—as the plaintiffs concede by acknowledging that the 2008 RMP HA determination

could have been challenged alongside a challenge to the 2009 Gather Decision.  *See* Pls.' Opp'n

at 41–42.  Accordingly, the statute of limitations on review of the 2008 RMP HA determination

expired no later than 2015, three years before the plaintiffs brought this suit.  *See, e.g.*, *Shasta*

*Res. Council v. U.S. Dep't of the Interior*, 629 F. Supp. 2d 1045, 1054 (E.D. Cal. 2009)

("Plaintiffs did not formally challenge the 1993 RMP when it was issued fifteen years ago, and

any new challenge to its provisions would be untimely under the APA's six-year statute of

limitations." (citations omitted)).

## 2.    Reopening

In addition to contesting the date of accrual, the plaintiffs argue that the 2008 RMP HA

determination may be challenged as part of a claim against the 2018 Gather Decision because the

---

[10]        The D.C. Circuit's decision in *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006), is not to the contrary.  *Fund for Animals* held that a BLM "strategy" developed "to achieve nationwide AML," 460 F.3d at 16, and codified in a "budget request to Congress" that Congress funded, *id.* at 19, was not final agency action, *id.*  The Circuit analogized the funded budget request to a land use plan, stating that the Supreme Court has "held that [land use] plans themselves are generally unreviewable; it is only specific actions implementing the plans that are subject to judicial scrutiny."  *Id.* at 21.  As is evident, however, from the Circuit's reliance on *Ohio Forestry*, *see id.* at 22 (citing *Ohio Forestry*, 523 U.S. at 730), the Circuit was merely referring to the fact that challenges to land use plans are typically not ripe until implementation occurs in a site-specific decision. *See supra* note 9.

latter decision "is not a mere implementation" of the former.  Pls.' Opp'n at 41 n.13.  Although

the plaintiffs do not expressly say so, this argument appears to invoke the "reopening doctrine,"

which "allows an otherwise stale challenge to proceed because the agency opened the issue up

anew, and then reexamined and reaffirmed its prior decision."  *Wash. All. of Tech. Workers v.*

*U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 346 (D.C. Cir. 2018) (internal quotation marks

omitted) (quoting *P & V Enters.*, 516 F.3d at 1023).  "The doctrine only applies, however, where

the entire context demonstrates that the agency has undertaken a serious, substantive

reconsideration of the existing rule."  *All. for Safe, Efficient & Competitive Truck Transp. v. Fed.*

*Motor Carrier Safety Admin.*, 755 F.3d 946, 954 (D.C. Cir. 2014) (internal quotation marks

omitted) (quoting *P & V Enters.*, 516 F.3d at 1024).

 As an initial matter, the plaintiffs' insistence that the 2018 Gather Decision was "not a

mere implementation" is belied by the plaintiffs' own characterizations of this agency action.

Throughout their briefing, the plaintiffs repeatedly and consistently describe the 2018 Gather

Decision as "implementing" the 2008 RMP.  *See, e.g.*, Mem. Supp. Pls.' Mot. ("Pls.' Mem.") at

2, ECF No. 18-1 (describing the 2008 RMP as "implemented through the 2018 [Gather

Decision]"); *id.* at 19 (explaining that the 2018 Gather Decision was "designed to implement the

2008 Ely RMP"); *id.* at 22 ("In the 2018 [Gather Decision], BLM determined that it would

remove all wild horses from the Caliente Complex in order to implement the 2008 Final Ely

RMP."); Pls.' Opp'n at 1 ("BLM made this decision in the 2008 Ely Resource Management Plan

. . . and recently implemented it in the 2018 [Gather Decision]."); *id.* at 12 (stating that BLM

"dramatically reduce[d] the longstanding AML in the Caliente Complex from 73-147 wild horses

to zero wild horses in the 2008 RMP, and then implement[ed] this change in the 2018 [Gather

Decision]").  In fact, even in discussing the statute-of-limitations issue, the plaintiffs adopt the

very framing they contest. *See* Pls.' Opp'n at 42 n.14 ("The site-specific 2018 [Gather Decision] . . . expressly implement[s] the 2008 RMP and Final EIS."). The plaintiffs themselves thus undermine their assertion that the 2018 Gather Decision reopened the 2008 RMP HA determination.

More fundamentally, the plaintiffs' argument fails because at every possible juncture, BLM relayed that the HA determination in the 2008 RMP was *not* being reconsidered as the agency determined what site-specific action to take in 2018. BLM explained, for instance, that the purpose of its proposed action was "to remove all excess wild horses from areas not designated for their long-term maintenance . . . in conformance with the decision in the 2008 Ely RMP to return these areas to HA status," AR 7, conveying that BLM was focused on *achieving* AML, not *reassessing* it. Similarly, when commentators requested that BLM revise the AML, BLM expressly declined to do so, explaining that "[t]he purpose of this [decision] is to gather excess horses, not to reaffirm or modify the Appropriate Management Level." AR 98; s*ee also, e.g.*, AR 94 ("BLM cannot use regulations at 43 CFR 4710.5 to manage horses and livestock in a manner that is inconsistent with the RMPs. A land-use plan amendment or revision would be necessary to reallocate use in this manner . . . ."); AR 96 ("BLM must manage wild horses in the HAs consistent with the land-use plan."); AR 97 ("Here, BLM has [already] determined that management of an AML of zero horses is appropriate, as reflected in the land-use plan.").

Notwithstanding that BLM repeatedly stated that the agency was not revisiting the 2008 RMP HA determination, the plaintiffs contend that BLM in fact reconsidered the issue by "expressly rel[ying] on 'data collected . . . during 2009 – 2017,'" a period that postdated the 2008 RMP. Pls.' Opp'n at 41 n.13 (omission in original) (quoting AR 7). This contention misconstrues the reason BLM relied on post-2008 data. BLM did not look to that data to decide

*how many* horses should be in the Caliente Complex, but to determine *how* and *when* to achieve the AML of zero. Indeed, by statute, BLM is required to consider all relevant "information" that "becomes available to [it]" when it determines whether "action is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2); *see also infra* Part III.C.1 (explaining the scope of gather decisions). Review of post-2008 data, then, did not transform the 2018 Gather Decision into a reassessment of the AML.

In short, BLM did not—explicitly or implicitly—reopen the 2008 RMP HA determination in the process of issuing the 2018 Gather Decision, and thus the reopening doctrine does not apply.

\* \* \*

The decision not to manage the Caliente Complex for horses was made over a decade ago, over the objections of one of the plaintiffs, *see* Compl. ¶ 11, yet the plaintiffs took no steps to challenge that 2008 decision, even when BLM implemented it in the 2009 Gather Decision. The plaintiffs' decision to sit on their hands until the issuance of the 2018 Gather Decision carries consequences. The plaintiffs remain free to engage in efforts to persuade BLM to reconsider its decision, to petition Congress to intervene, or to participate in any agency decisionmaking process that occurs when the 2008 RMP requires revision. What they may not do is ignore the limitations period applicable to challenges to agency action. As to the 2008 RMP, the plaintiffs' claims are simply not timely. *Accord Cloud Found. v. U.S. Bureau of Land Mgmt.*, No. 3:11-cv-00459-HDM-VPC, 2013 WL 1249814, at \*10 n.11 (D. Nev. Mar. 26, 2013) ("[S]imply because plaintiffs are not currently able to challenge the relevant RMPs in this case does not mean they could not have done so when the RMPs were drafted or revised.").

Notwithstanding the defendants' successful timeliness defense to the plaintiffs' challenge to the 2008 RMP, as discussed next, other aspects of the plaintiffs' claims survive.

### 3. The Plaintiffs' Remaining Challenge

Although the plaintiffs' challenge to the 2008 RMP HA determination is untimely, the 2008 RMP is not the only agency action at issue. The plaintiffs' three claims also allege that the 2018 Gather Decision was issued in violation of the WHBA, NEPA, and the APA, *see* Compl. ¶¶ 81, 94–99, 101, and the plaintiffs' requested relief includes vacatur of the 2018 Gather Decision, *see id.* at 37 (prayer for relief). The defendants believe that the plaintiffs' challenge to the 2018 Gather Decision is, like the challenge to the 2008 RMP, foreclosed on statute-of-limitations grounds, because "at bottom, all of [the plaintiffs'] claims are ultimately attacking the underlying decision to not manage the Complex for horses." Defs.' Opp'n at 13. The defendants are incorrect.

While the statute of limitations has indeed rendered the plaintiffs' arguments and requested relief regarding the 2008 RMP untimely, *see* Pls.' Mem. at 25–32, 38–39 (primarily challenging the 2008 RMP); Pls.' Opp'n at 3–5, 8, 12–14, 20–28, 34–35 (same), other arguments asserted by the plaintiffs pertain solely to the 2018 Gather Decision, *see, e.g.*, Pls.' Opp'n. at 14–20 (arguing that "BLM's 2018 EA failed to take a 'hard look' at environmental impacts of livestock in comparison to wild horses," *id.* at 14 (capitalization altered)), which is also a final agency action and which is well within the applicable limitations period for judicial review. Accordingly, the merits of the plaintiffs' challenge to the 2018 Gather Decision will be considered. *See, e.g.*, *Wild Fish Conservancy v. Nat'l Park Serv.*, 8 F. Supp. 3d 1289, 1296 (W.D. Wash. 2014) (concluding that challenge to EISs was untimely but reaching the merits of "whether the . . . EA was properly tiered to the EISs"); *Am. Forest Res. Council v. Ashe*, 946 F.

Supp. 2d 1, 21 (D.D.C. 2013) (explaining that plaintiffs' claims directed at recent agency actions were timely but challenge to 1996 rule presented timeliness issues).

### C. Wild Free-Roaming Horses and Burros Act Claim

Stripped of the untimely challenge to the 2008 RMP, the plaintiffs' WHBA claim is nothing more than a garden-variety challenge to a BLM gather decision. The scope of such agency action is narrowly circumscribed by law, and BLM properly acted within that scope when issuing the 2018 Gather Decision.

### 1. BLM Gather Decisions Generally

BLM gather decisions are but one step in a comprehensive process—prescribed by statute and regulation—to which BLM must adhere in the management of wild free-roaming horses.

The first step in the process is the one that, due to untimeliness, the plaintiffs are foreclosed from challenging: establishment of an area's AML, including establishment of an effective AML by designating an area as an HA. Often, "AMLs are set within the RMPs." *Cloud Found. v. U.S. Bureau of Land Mgmt.*, No. 3:11-cv-00459-HDM-VPC, 2013 WL 1249814, at *10 (D. Nev. Mar. 26, 2013); *see also Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 15 (D.C. Cir. 2006) (noting that HMAs are "established in accordance with broader land use plans"). Indeed, in the case of an AML of zero, BLM has interpreted its regulations to *require* that such an AML be set pursuant to an RMP. *See* BLM HANDBOOK, App. C at 7; *see also* 43 C.F.R. §§ 4710.1, 4710.4. Once an AML determination is made in an RMP, that determination is final and binds BLM unless and until BLM revises it. *See supra* Part III.B.1.b. (explaining that the 2008 RMP HA determination was final agency action); *see also In Def. of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1064 n.13 (9th Cir. 2014) ("[N]othing in the [WHBA] requires the BLM to determine new AMLs based on current

conditions every time the BLM decides to take action to restore the already-established AMLs.").

After an AML is set, the WHBA "direct[s]" BLM to "determin[e] where wild horse . . . overpopulations exist." *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1317 (D.C. Cir. 1982) (Ginsburg, Ruth B., J.) (citing 16 U.S.C. § 1333(b)(1)). To comply with this directive, BLM "maintain[s] an inventory of wild horses roaming the public lands," *id.*, and compares that inventory to the existing AML, which functions as "a trigger by which [] the BLM is alerted to address population imbalance," *In Def. of Animals*, 751 F.3d at 1064 (alteration in original) (internal quotation mark omitted) (quoting *In Def. of Animals v. U.S. Dep't of the Interior*, 909 F. Supp. 2d 1178, 1192 (E.D. Cal. 2012)).

"Once BLM determines that an overpopulation in fact exists in a given area, the agency has wide discretion in how it addresses that overpopulation." *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1282 (D. Utah 2017). The WHBA permits BLM to "achieve[]" "appropriate management levels" "by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on populations levels)." 16 U.S.C. § 1333(b)(1). This discretion, however, is limited in a key way: the WHBA "*requires*" BLM "'immediately [to] remove excess animals from the range so as to achieve appropriate management levels'" when "the Bureau determines 'that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals.'" *Fund for Animals*, 460 F.3d at 16 (alteration in original) (emphasis added) (quoting 16 U.S.C. § 1333(b)(2)). In making that determination, BLM is obligated to consider "(i) the current inventory of lands within [its] jurisdiction; (ii) information contained in any land use planning completed pursuant to section 1712 of Title 43; (iii) information contained in court ordered

environmental impact statements as defined in section 1902 of Title 43; and (iv) such additional information as becomes available to [it] from time to time." 16 U.S.C. § 1333(b)(2). Yet, in the event of "the absence of the information contained in (i-iv)," BLM must still act "immediately" "on the basis of all information currently available to [the agency]." *Id.*

Importantly, the WHBA requires that BLM rely on the established AML when determining whether excess wild horses are present in a particular area. *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1008 (D. Nev. 2018), *appeal docketed*, No. 18-17415 (9th Cir. Dec. 21, 2018). As the Ninth Circuit has explained, "the statute determines 'excess animals' through the use of AML levels," as it provides that BLM "'shall immediately remove excess animals from the range *so as to achieve appropriate management levels*.'" *In Def. of Animals*, 751 F.3d at 1063 (emphasis in original) (quoting 16 U.S.C. § 1333(b)(2)). "Although the statute also provides that '[s]uch action shall be taken . . . until all excess animals have been removed *so as to restore a thriving natural ecological balance*,' the most logical reading of those two phrases together is that the BLM must achieve a 'thriving natural ecological balance' by maintaining the relevant AMLs." *Id.* (emphasis in original) (quoting 16 U.S.C. § 1333(b)(2)). Further, BLM must consider "information contained in any land use planning," 16 U.S.C. § 1333(b)(2), which necessarily requires consideration of the AML set in an existing RMP. Accordingly, "courts have upheld excess horse determinations based primarily—if not solely—on the AML." *Cloud Found.*, 2013 WL 1249814, at *7 (citing *In Def. of Animals*, 909 F. Supp. 2d at 1192, *aff'd*, 751 F.3d 1054, and *Cloud Found., Inc. v. Kempthorne*, No. CV-06-111-BLG-RFC, 2008 WL 2794741, at *1 (D. Mont. July 16, 2008)); *see also Friends of Animals v. Bureau of Land Mgmt.*, No. 2:16-cv-1670-SI, 2018 WL 1612836, at *18 (D. Or. Apr. 2, 2018) ("WHBA instructs BLM

to remove excess horses to bring the population within AML; it does not require BLM make yet another finding that removal *to the AML* is necessary." (emphasis in original)).

In sum, in deciding whether to conduct a gather, BLM is obligated to determine whether action is necessary to remove excess animals. In doing so, BLM must rely on any AML set in an RMP, and, when necessary, must act immediately, even if more relevant information could become available at a later date. *See Blake v. Babbitt*, 837 F. Supp. 458, 459 (D.D.C. 1993) ("When a determination is made that there is an over-population of wild horses, action is required based on the knowledge currently available, even if it is not complete. Adjustments can be made later, but the endangered and rapidly deteriorating range cannot wait." (citation omitted)).

### 2.     The 2018 Gather Decision

Here, BLM complied with the WHBA and appropriately determined that action is necessary to remove excess wild horses in the Caliente Complex. BLM explained that, "[u]nder the 2008 Ely District RMP, no wild horses are to be managed within the Caliente HA Complex." AR 3. Yet, as of 2017 BLM had identified in the Complex "an estimated population of 1,744 . . . wild horses," and determined that "the estimated population [would] increase 20% a year after the 2017 inventory." AR 6. BLM assessed the ecological impact of this overpopulation, relying on "[m]onitoring data collected for the HA's during 2009 - 2017," AR 7, the pre-2009 analysis that had informed the 2008 AML determination, *see* AR 6, and the AML itself, *see* AR 4. BLM found, *inter alia*, that "[i]nsufficient herbaceous forage within the dominant ecological sites does not support healthy wild horses, and has led to excess utilization and trampling which is

currently impacting range conditions by causing deterioration of vegetative resources (including at riparian areas) and is preventing recovery of key sites." AR 34.

Based on this assessment, BLM concluded that the wild horses in the Complex are "excess wild horses," and that a "gather is necessary to remove [them]." AR 104. This analysis was both appropriate for a gather decision and sufficient to support BLM's conclusion that the horses must be removed. *See, e.g.*, *In Def. of Animals*, 751 F.3d at 1062–63 ("Given the undisputed fact that the wild horse and burro populations greatly exceeded their respective AMLs at the time of the gather, and the carefully-documented concerns about the deterioration of riparian areas and cultural sites caused by overpopulation, as well as the likelihood of insufficient forage to sustain the growing herd, the BLM properly decided action was necessary to restore the AMLs." (footnote omitted)); *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 63–64 (D.D.C. 2017) (finding logic underlying BLM's excess determination was "sound" where "determination was based on an assessment of current herd size and relevant ecological conditions" and "made by reference to the AML for the [relevant HMA]").

The plaintiffs dispute BLM's assessment on several grounds. First, the plaintiffs contend that "BLM provided no data or analysis to support its" conclusions. Pls.' Mem. at 31. The record shows otherwise. BLM engaged in a thorough review of the options available and the likely impacts of each option before deciding to proceed with a gather. *See* AR 10–44. Moreover, the WHBA requires that BLM act "*immediately*" when removal of wild horses is necessary based on "information *currently* available to [the agency]." 16 U.S.C. § 1333(b)(2) (emphases added). As the D.C. Circuit has instructed, "BLM's findings of wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information." *Watt*, 694 F.2d at 1318.

Next, the plaintiffs disagree with BLM's conclusion that the Caliente Complex lacks sufficient resources to support a wild horse population, making removal of the wild horses necessary. By BLM's own estimations, the plaintiffs point out, "there are adequate resources [in the Caliente Complex] to support 3300 cows," Pls.' Mem. at 27, and, moreover, the Complex contains a "*growing* population of wild horses," illustrating that the Complex can, in fact, support wild horses, *id.* at 29 (emphasis in original). Yet, BLM expressly addressed the livestock issue, explaining that "[u]nlike wild horses, livestock can be actively managed through use of water developments owned or controlled by the permittees and can be removed from the range if . . . there is insufficient forage available." AR 89; *see also Cloud Found.*, 2013 WL 1249814, at *10 n.11 ("[N]o law compel[s] BLM to make adjustments to livestock grazing preferences in order to accommodate more wild horses."). Further, the fact that "horse numbers [may] exceed the AMLs for a period of time . . . does not prove that the range can support that number of animals *long term*." *Cloud Found.*, 2013 WL 1249814, at *10 n.11 (emphasis added).

Third, the plaintiffs claim that "the record shows that the failure to achieve rangeland health standards was due primarily to fire and livestock use, *not* wild horse use." Pls.' Mem. at 27–28 (emphasis in original) (citing AR 9637, 9468). BLM, however, does not need to determine that wild horses are the *only* cause of relevant ecological damage before deciding that removal of wild horses is necessary. Indeed, some courts have held that BLM may remove even wild horses that merely "*threaten* to disturb [the ecological] balance," and thus BLM clearly may remove "those horses that have already done so." *Cloud Found.*, 2013 WL 1249814, at *8 (emphasis in original); *see also In Def. of Animals*, 751 F.3d at 1063 ("Preservation efforts can hardly require prior destruction of what is to be preserved. . . . BLM may determine removal is

necessary to ensure that the current thriving natural ecological balance does not deteriorate in the future.").

Fourth and finally, the plaintiffs argue that BLM failed to consider viable alternatives to removal, "such as reductions in livestock grazing, rangeland improvements, or managing HMAs as complexes as BLM had done in the past." Pls.' Mem. at 27.[11] These alternatives, however, could not be effectuated through a gather decision. *See supra* Part III.C.1 (explaining the scope of gather decisions); *Cloud Found.*, 2013 WL 1249814, at *10 n.11 ("[P]laintiffs cite no authority for the proposition that large-scale adjustments which alter the balance in favor of wild horse may be accomplished outside the RMP process."). Accordingly, BLM correctly treated these alternatives as what they were: requests to amend the RMP, not plausible routes to achieving the effective AML. *See Cloud Found.*, 2013 WL 1249814, at *10 ("[P]laintiff's argument that the range must be devoted principally to livestock and not to wild horses should be asserted through the RMP process. There is no evidence plaintiffs have ever challenged the applicable RMPs." (citations omitted)); *see also Cloud Found., Inc. v. Salazar*, 999 F. Supp. 2d 117, 125 (D.D.C. 2013) ("Range expansion is not the type of decision that can be made in a [herd management area plan ('HMAP')]. Rather . . . '[d]esignation of a wild horse territory *is* a "land use" decision, appropriately addressed at the Forest Plan scale, rather than the scale for the HMAP revision.'" (second alteration and emphasis in original) (quoting administrative record)).

BLM properly determined that the wild horses in the Caliente Complex are "excess animals" under the WHBA and that removal is necessary to achieve the effective AML. Therefore, the defendants are entitled to summary judgment on Claim I.

_____

[11] The plaintiffs also assert that when an agency "fail[s] to consider . . . an option at the programmatic level, it [is] obligated to consider such an option at the site-specific level." Pls.' Opp'n at 7 n.2 (citing *W. Watersheds Proj. v. Abbey*, 719 F.3d 1035, 1051 (9th Cir. 2013)). This argument, however, is drawn from NEPA caselaw, not WHBA caselaw, and thus is addressed in the discussion of the plaintiffs' NEPA claim, *infra*, in Part III.D.2.

**D.      National Environmental Policy Act Claim**

The plaintiffs challenge in Claim II the sufficiency under NEPA of the 2018 Gather Decision's EA ("2018 EA").  They question whether BLM took a sufficiently "hard look" at the planned gathers' environmental impacts, whether BLM considered all reasonable alternatives, and whether BLM adequately disclosed relevant environmental information before issuing its decision.  None of the arguments put forward by the plaintiffs is legally sufficient or persuasive.

**1.      "Hard Look" Review**

NEPA "requir[es] federal agencies to take a 'hard look' at their proposed actions' environmental consequences in advance of deciding whether and how to proceed."  *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015).  "The definition of 'hard look' may be 'imprecise,'" but the D.C. Circuit has made clear that "an agency has taken a 'hard look' at the environmental impacts of a proposed action if 'the statement contains sufficient discussion of the relevant issues and opposing viewpoints, and . . . the agency's decision is fully informed and well-considered.'"  *Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1324–25 (D.C. Cir. 2015) (omission in original) (internal quotation marks omitted) (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).

The plaintiffs contend that BLM failed to conduct a "hard look" in the 2018 EA in two ways.  First, they maintain that BLM's decision was not well-considered because BLM's own "utilization studies" demonstrated other causes of rangeland deterioration, such as "fires."  Pls.' Opp'n at 16.  This argument is easily dispatched.  The plaintiffs do not contend that the relevant utilization studies showed that wild horses cause *no* ecological damage.  Rather, their complaint is that "wild horses were not the *sole* cause" of the damage.  *Id.* (emphasis added).  As explained, *supra*, in Part III.C.2, the WHBA does not demand that BLM determine that horses are the only

37

cause of ecological damage before BLM concludes that removal of wild horses is necessary, and the plaintiffs cite no reason why NEPA would require more on this score.

Second, the plaintiffs claim that the "hard look" obligation "requires agencies to consider . . . the 'combined' effects of managing different species using a given area," Pls.' Mem. at 33 (quoting *Friends of Animals v. Clark*, 27 F. Supp. 2d 8, 13 (D.D.C. 1998)), and that BLM failed to do so by not taking "*any* look, at the direct, indirect, or cumulative impacts of the significant livestock grazing BLM permits in the Caliente Complex" in the 2007 EIS and the 2018 EA, *id.* at 34 (emphasis in original). Even if, as the plaintiffs claim, the impact of livestock grazing had not been considered in the 2007 EIS when assessing the AML for the Caliente Complex, the plaintiffs fail to explain how the number of grazing permits would bear *now* on the methods BLM should use to reach the effective AML of zero and accomplish the removal of horses from the Complex, which was the sole concern of the 2018 Gather Decision. *See supra* Part III.C.1 (explaining the scope of gather decisions). Indeed, the plaintiffs' arguments on this issue primarily target the 2008 RMP process resulting in conversion of all remaining HMAs in the Caliente Complex into HAs establishing the effective AML for wild horses of zero. *See e.g.,* Pls.' Mem. at 33 (complaining about "adjusting AML . . . to zero"); *id.* at 34 (complaining about "dropping eight HMAs to HA status"); *id.* at 35 (complaining about BLM's decision "to eliminate the horses from this area of public lands"); *id*. at 36 (complaining about "zeroing out the [Delmar Mountains] HMA"); *id*. at 37 (complaining about BLM's decision "to eliminate every single wild horse"). These arguments challenging the 2008 RMP HA determination are untimely and, no matter how vigorously asserted over multiple pages of briefing, do not raise a legally sufficient attack on the 2018 Gather Decision. As the D.C. Circuit recently explained, "once an agency has taken a 'hard look' at 'every significant aspect of the environmental impact'

of a proposed major federal action, it is not required to repeat its analysis simply because the agency makes subsequent discretionary choices in implementing the program." *Indian River Cty. v. U.S. Dep't of Transp.*, 945 F.3d 515, 533 (D.C. Cir. 2019) (quoting *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)).

As to the plaintiffs' repeated criticism of the 2007 EIS for failing to consider the combined impact of livestock and wild horses in the area, this criticism simply masks the plaintiffs' disagreement with the conclusion of BLM's analysis. BLM did in fact consider the cumulative impacts of wild horses and livestock in the 2007 EIS, determining that even if all livestock were removed from the Caliente Complex, considerations that required removal of wild horses would remain. *See* AR 3512. In the 2018 Gather Decision, BLM was not required to second-guess this analysis that had occurred in a NEPA document that was both unchallenged and over a decade old. The effective AML for wild horses was already set at zero, rendering additional analysis in 2018 of livestock grazing immaterial. *See Grunewald v. Jarvis*, 776 F.3d 893, 906 (D.C. Cir. 2015) (determining that NEPA permitted National Park Service to analyze deer management plan and exotic plant management plan in separate NEPA documents when both actions "related to the [same] General Management Plan"); *Clark*, 27 F. Supp. 2d at 13 (requiring that environmental impacts of programs be considered together only because they had *not* previously been addressed in the same document).

Accordingly, while the plaintiffs are critical of the 2007 EIS's analysis of "the impacts of livestock grazing and wild horse use on the Caliente Complex," Pls.' Mem. at 36, BLM did not have to repeat this analysis for implementation of the 2008 RMP in the 2018 Gather Decision.

## 2.      Consideration of Alternatives

Relatedly, the plaintiffs claim that BLM violated NEPA by failing to consider reasonable alternatives.  Courts "evaluat[e] an agency's choice of 'reasonable alternatives' in light of the objectives of the federal action," *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999), applying a two-part test.  First, courts determine "whether the agency has reasonably identified and defined its objectives," *id.*, affording "considerable deference to the agency's expertise and policy-making role," *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011) (internal quotation marks omitted) (quoting *Slater*, 198 F.3d at 867).

Second, courts consider "whether a particular alternative is reasonable in light of these objectives," *Slater*, 198 F.3d at 867.  "An alternative is 'reasonable' if it is objectively feasible as well as 'reasonable in light of the [the agency's] objectives.'" *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72 (alteration in original) (quoting *Slater*, 198 F.3d at 867).  Thus, the agency's "purpose and need for action . . . will determine the range of alternatives and provide a basis for the selection of an alternative in a decision." *Id.* at 72–73 (internal quotation mark omitted) (quoting 43 C.F.R. § 46.420(a)(2)); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) ("The goals of an action delimit the universe of the action's reasonable alternatives.").  An agency's choice of and among alternatives does not take place in a vacuum but in the context of authorizing statutes, which reflect legislative purposes and intent regarding agency action.  *See Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73.  "[A]n alternative is properly excluded from consideration . . . if it would be reasonable for the agency to conclude that the alternative does not 'bring about the ends of the federal action.'" *Slater*, 198 F.3d at 867 (quoting *Citizens Against Burlington*, 938 F.2d at 195); *see also* 43 C.F.R.

§ 46.420(b) (defining "reasonable alternatives" as "alternatives that are technically and economically practical or feasible and meet the purpose and need of the proposed action").

"Importantly, [courts] review both an agency's definition of its objectives and its selection of alternatives under a 'rule of reason.'" *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73. Courts "generally defer to the agency's reasonable definition of objectives" "as long as the agency 'look[s] hard at the factors relevant to the definition of purpose.'" *Id.* (alteration in original) (quoting *Citizens Against Burlington*, 938 F.2d at 196). Further, "if the agency's objectives are reasonable, [courts] will uphold the agency's selection of alternatives that are reasonable in light of those objectives." *Grunewald*, 776 F.3d at 904 (internal quotation marks omitted) (quoting *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73).

Here, the plaintiffs argue that BLM was obligated "to consider the obvious alternative of reducing livestock grazing." Pls. Mem. at 38 (capitalization altered). Yet, the purpose of the 2018 Gather Decision was "to remove all excess wild horses from areas [in the Caliente Complex] not designated for their long-term maintenance and to achieve and maintain a thriving natural ecological balance and multiple use relationship on the public lands . . . in conformance with the decision in the 2008 Ely RMP to return these areas to HA status." AR 7. This was not only an appropriate purpose in light of the statutory scheme, but also the required one. *See supra* Part III.C.1 (explaining the scope of gather decisions). The range of reasonable alternatives is delimited by the goal of removing wild horses from the Caliente Complex, and the plaintiffs' proposal to reduce livestock grazing permits would not help achieve that objective. Consequently, this proposal is outside the range of reasonable alternatives and merely reflects the

plaintiffs' disagreement with the purpose itself. BLM therefore properly rejected reduction of livestock grazing as an alternative.[12]

Relevant caselaw is in accord. Indeed, the courts of appeals for both circuits often called upon to review BLM actions that take place in Nevada—the D.C. Circuit and the Ninth Circuit—have upheld agencies' refusal to consider alternatives in cases involving removal of animals and proposed alterations to grazing practices because the alternatives were inconsistent with agency-defined objectives. *See Grunewald*, 776 F.3d at 904 (concluding that "it was not unreasonable for the Park Service to define its objectives in terms of abating the effects of deer browsing and trampling" and thus the agency "did not err when it failed to include removing exotic plants as a stand-alone alternative"); *W. Watersheds Proj. v. Abbey*, 719 F.3d 1035, 1046 (9th Cir. 2013) (determining that "BLM's interpretation of the Proclamation to allow the continued use of its grazing management was reasonable under [applicable law]" and thus "BLM did not violate NEPA by excluding changes to its grazing practices from the scope and purpose of the Breaks Resource Plan"); *see also Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1015–16 (D. Nev. 2018) ("[D]efendants explained that this alternative would simply exchange a limited amount of current forage used by livestock for use by wild horses, which would not meet the purpose and need of the project to reduce wild horse growth rates; moreover, the proposed alternative would not conform to existing land use plans."), *appeal docketed*, No. 18-17415 (9th Cir. Dec. 21, 2018); *Cloud Found. v. U.S. Bureau of Land Mgmt.*, No. 3:11-cv-00459-HDM-VPC, 2013 WL 1249814, at *18 (D. Nev. Mar. 26, 2013) ("BLM provided an appropriate explanation as to why

---

[12] The plaintiffs also argue that BLM was required to "explore the impacts of requiring permittees to make certain water sources available to wild horses, or to undertake range improvements as conditions of their grazing permits," Pls.' Opp'n at 18 n.6, but the same reasoning disposes of these arguments.

it rejected the livestock reduction alternative: it simply could not reduce livestock grazing allotments through the gather process.").

The plaintiffs rejoin that BLM never considered reduction of livestock as an alternative when it made the 2008 RMP HA determination and that when an agency "fail[s] to meaningfully consider . . . an option at the programmatic level, it [is] obligated to consider such an option at the site-specific level." Pls.' Opp'n at 7 n.2. Contrary to the plaintiffs' characterization of the record, the 2007 EIS that led up to the 2008 RMP in fact considered an "Alternative D" that would have "exclude[d] all permitted, discretionary uses of the public lands *including livestock grazing*." AR 3010 (emphasis added). Although BLM did not, as the plaintiffs' would have liked, assess an option that would have lowered "*both* wild horse populations *and* livestock grazing levels" simultaneously, Pls. Opp'n at 34 (emphases in original), BLM already had concerns about the horse herds' genetic diversity and vulnerability to disease, starvation, and dehydration at the pre-2008 AML levels, *see* AR 3506–07, making BLM's decision not to consider reduced (but not eliminated) wild horse populations, with or without accompanying livestock grazing reductions, reasonable.

### 3. Disclosure of Environmental Information

During the NEPA process, an agency "must insure that environmental information is available to . . . citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b); *see also Robertson*, 490 U.S. at 349 (noting that NEPA's disclosure requirement "guarantees that the relevant information will be made available to the larger audience that may . . . play a role in both the decisionmaking process and the implementation of that decision"); *Balt. Gas & Elec. Co.*, 462 U.S. at 97 (noting that NEPA "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process"). An

agency's disclosure "must be 'sufficient to enable those who did not have a part in [the NEPA document's] compilation to understand and consider meaningfully the factors involved.'" *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 368 (D.C. Cir. 1981) (quoting *Envtl. Def. Fund, Inc. v. Corps of Eng'rs*, 492 F.2d 1123, 1136 (5th Cir. 1974)).

The plaintiffs contend that BLM did not satisfy this obligation for two reasons. First, the plaintiffs claim that BLM "refuse[d] to provide the data" that would have allowed the public "to differentiate between the impacts from wild horses and livestock." Pls.' Mem. at 44. This argument is a nonstarter. Reduction of livestock was outside the scope of the 2018 Gather Decision, *see supra* Part III.C.1, and BLM therefore had no obligation to provide data related to livestock use.

Second, the plaintiffs complain that BLM did not furnish to the public the 2009–2017 monitoring data it relied on. *See* Pls.' Opp'n at 15–16. BLM, however, summarized what the monitoring revealed about the horses' ecological impact, *see* AR 7, 34, and, importantly, provided data from utilization studies conducted at both the Caliente Complex as a whole and at several individual HAs within the Complex, *see* AR 8990, 8998–99, 9001, 9005, 9013, 9057–96. That data was sufficient to permit the public to engage in meaningful discussion with BLM on the key issues and to challenge BLM's conclusions, as evidenced by the arguments that the plaintiffs themselves raised in this suit in reliance on such studies. *See, e.g.*, Pls.' Opp'n at 16 (arguing that "[t]hese [utilization] studies actually reinforce the need for the very analyses that Plaintiffs called for"). NEPA requires nothing more.

\* \* \*

BLM's 2018 Gather Decision was issued after the agency took a sufficiently "hard look" at the environmental impacts of that action, considered reasonable alternatives, and disclosed

relevant environmental information to the public to enable participation in the process.  Thus, the plaintiffs' Claim II fails.[13]

## IV.     CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Summary Judgment, ECF No. 18, is denied, and the defendants' Cross-Motion for Summary Judgment, ECF No. 20, is granted.

An appropriate Order accompanies this Memorandum Opinion.

Date: February 13, 2020

_____
BERYL A. HOWELL
Chief Judge

---

[13]     As the plaintiffs only alleged violations of the APA "through the WHA and NEPA," Compl. ¶ 100, the plaintiffs' Claim III also fails.